[No. 27222. Department One. January 3, 1939.]

THE STATE OF WASHINGTON, *Respondent,* v. F. H. PASCHALL *et al., Appellants.*[1]

[1]Reported in 85 P. (2d) 1046.

584

*H. Sylvester Garvin* and *Anthony Savage*, for appellants Paschall *et al.*

*Lundin, Barto & Devin*, for appellant Whalen.

*B. Gray Warner, John M. Schermer,* and *Harry A. Bowen,* for respondent.

BLAKE, J.—The defendants were charged with the crime of murder in the second degree, in that

"They, said F. H. Paschall, W. F. Stevenson and P. L. Whalen, and each of them, in the county of King, state of Washington, on or about the 26th day of March, 1938, while unlawfully and feloniously engaged in the commission of and in an attempt to commit a felony, to-wit: assault in the second degree, then and there wilfully, unlawfully and feloniously did strike and beat one Berry Lawson, a human being, thereby mortally wounding said Berry Lawson, from which said mortal wounds the said Berry Lawson then and there died."

From judgments and sentences entered upon verdicts finding them guilty of manslaughter, defendants appeal.

Appellants did not testify, nor did they proffer any evidence in their own behalf. The facts established by the evidence adduced by the state are as follows:

About two o'clock a. m. of March 26, 1937, the appellants, who were police officers, went to the Mt. Fuji hotel, in Seattle, to take in custody an Indian woman by the name of Lenora Johnson. The main floor of the hotel is the second floor of the building in which it is situated, and is reached by a straight flight of stairs ascending from Yesler way. At the top is a small hall, to the right of which is a room called the lobby. In this room was a stove, near which, when the officers arrived, the deceased, Berry Lawson, was sitting in a chair asleep.

The Indian woman having been taken in custody, it seems that the proprietor of the hotel asked the officers to take Lawson out. In any event, two of them began to shake him. They had some difficulty in waking him. On being awakened, he began to kick. Then one of the officers began to beat him. Some ten or a dozen blows were struck, mostly about the body. One witness testified that Lawson was struck twice in the face. He was then handcuffed, and two of the officers led him down the stairs. The other followed with the Indian woman. Lawson, between the two officers, walked down the stairs and across the street, where he got into the officers' car. He sat in the middle on the back seat, the Indian woman being on one side of him and one of the officers on the other. They drove to the police station, four or five blocks away. On the way Lawson said: "I am awful sick." One of the officers said: "You will be worse than that before we get through with you."

When they arrived at the station, the handcuffs were taken off Lawson. At the elevator, one of the officers told another to "take the woman upstairs." She and one of the officers entered the elevator. The other two officers remained with Lawson. As the elevator

started up, one was standing in front of, and the other behind, Lawson. The Indian woman testified:

"Q. Then were you taken up in the elevator? A. Yes. Q. To the booking office? When was the next time you seen Barry Lawson? Was he alive or dead? A. Well, he looked like he was dead. He was stiffened out then, and his eyes rolled back, and he was all full of blood, and Mr. Whalen was on his knees unbuttoning his vest. Q. Where was he laying? A. He just pulled him out of the elevator and laid him on his back. Q. How did they pull him out of the elevator? A. By the arms. Mr. Whalen came up alone with him. Q. He came up alone with him? A. Yes. Q. Then what did he do? A. He pulled him out by his arms. He grabbed his arms. His arms was up this way (indicating) when he laid him down."

If Lawson was not then dead, he died within a few minutes. For he was dead when the resident police surgeon, who was in the building, reached him. The surgeon suspected the cause of death to be "a basal skull fracture because there was a little bit of watery fluid in his nostrils." The officers told the surgeon that, when they were leading Lawson downstairs at the hotel, he broke away from them, as though to run, and fell half-way down the flight of stairs.

The post mortem autopsy showed that Lawson's nose was badly crushed, but no skull fracture. There were faint contusions over the front of the face, right temple, front of chest, and both collar bones. There was a massive contusion of both frontal lobes of the brain, which were covered with hemorrhage about two inches out on the side of each lobe. The temporal lobes were also covered with hemorrhage. The injuries to the brain were sufficient to cause death within a few minutes. The injury

". . . could have been caused by a single very violent impact, or it could have been caused by a number of impacts with a very blunt object all pretty

much in the same line, that is repeated in pretty much the same place."

A coroner's inquest was held on March 31st. In the meantime, the appellants paid one Franey two hundred fifty dollars to attend the inquest and testify. He testified that he saw Lawson fall down the hotel steps at the time of the arrest. On the trial of this case, he admitted that his testimony given at the inquest was false. The appellants also paid money to one Downs to get him out of town before the inquest. Downs testified at the inquest and on the trial of this case that he was at the hotel when Lawson was arrested; that Lawson did not fall down the stairs. Downs also testified that he saw one of the officers strike Lawson several blows while he was being held by the other two.

In this narration of the facts, we have not thought it necessary to ascribe to each officer the part the evidence shows him to have taken, either with respect to the beating of Lawson, or with respect to suborning Franey to perjury, or with respect to the attempt to suppress Downs' testimony at the inquest. For, as to each of these episodes of the tragedy, the evidence is sufficient to connect each of the appellants with active participation at one stage or another. While the appellants may not be morally chargeable in the same degree for Lawson's death, they are chargeable in law as principals. Rem. Rev. Stat., § 2260 [P. C. § 8695]; *State v. Nichols,* 148 Wash. 412, 269 Pac. 337.

Appellants have made twenty-one assignments of error. The first three are directed to the information by way of (a) demurrer, (b) motion to make more definite and certain, and (c) motion for a bill of particulars.

The information was drawn in terms of the statute (Rem. Rev. Stat., § 2393 [P. C. § 8998]). Such an information is sufficient (*State v. Larson,* 178 Wash.

227, 34 P. (2d) 455), even though the felony upon which the charge of second degree murder rests is not circumstantially described. *State v. Fillpot,* 51 Wash. 223, 98 Pac. 659; *State v. Ryan,* 192 Wash. 160, 73 P. (2d) 735.

Nor was it error to deny the motions for a bill of particulars and to make the information more definite and certain. It was not made to appear that the state had knowledge of any ultimate facts of which appellants themselves were not cognizant. As a matter of fact, it would appear from the record that, prior even to the filing of the information, the state's attorneys disclosed to appellants or their counsel practically all of the facts concerning which evidence was adduced at the trial. Certainly appellants suffered no prejudice by the denial of the motions.

Appellants' next assignments of error are directed to the sufficiency of the evidence to sustain the verdicts. The argument in support of these assignments seems to be based upon the theory that the beating given Lawson at the hotel was insufficient to cause his death, and that there is no direct evidence of any subsequent beating by appellants. The inference which appellants would have us draw, as a matter of law, is that Lawson, some time prior to his arrest at the Mt. Fuji hotel, received the injuries from which he died.

The prosecuting attorney made a statement to the effect that the beating Lawson received at the hotel was not sufficient to cause death. And it is true there is no direct evidence that the officers made any assault upon Lawson after they left the hotel. Also, there is evidence, developed on cross-examination of the police surgeon, to the effect that ordinarily death would not follow such injuries within less than fifteen minutes to a half-hour. The conclusion of the argument is that, if

the beating administered to Lawson at the hotel was not sufficient to cause death, and since death followed so shortly after his arrival at the police station, the evidence of beating by appellants—direct on the one hand and circumstantial on the other—is insufficient to hold them responsible.

But we do not think the conclusion follows as a matter of law. For it will be remembered that there was evidence that Lawson was struck twice in the face at the hotel. It was for the jury, not the prosecutor, to say, under the evidence, whether these blows were sufficient to inflict the injuries which caused death. Likewise, it was for the jury to say whether the evidence was sufficient to establish circumstantially the fact that one or more of the officers inflicted further injuries at the police station. As we have seen, the autopsy surgeon testified that injury to Lawson's brain might have been caused by one violent impact or a series of impacts in the same line. Then, subsequent to Lawson's death, and prior to the inquest, we find a course of conduct on the part of appellants indicating a consciousness of guilt.

That Lawson, prior to the time he was taken in custody by appellants, might have sustained the injuries from which he died, is an inference the jury might have accepted. It is not one, however, that we can draw as a matter of law. The evidence, in our opinion, is abundantly sufficient to sustain the verdicts.

▮ Appellants next contend that the court erred in sending the jury to view the scene of the assault at the Mt. Fuji hotel. This was a matter within the trial court's discretion. Rem. Rev. Stat., § 2160 [P. C. § 9376]; *State v. Demas*, 114 Wash. 596, 195 Pac. 1001. We think this was a proper case to order a view of the premises. Certainly there was no abuse of discretion in doing so.

■ The next assignment of error is directed to the exhibition by the prosecuting attorney of a knuckle shot pad. This is a leather pad filled with bird shot, which fits over the knuckles. It is in common use among policemen, being worn, ordinarily, under a glove. The autopsy surgeon called it a "shock pad," explaining that it is sometimes filled with sand instead of shot, and said: "It gives tremendous shocking power."

It was not contended by the prosecutor that the pad in question was used by any of the appellants in assaulting Lawson, or that it was even in the possession of any one of them at that time. On the contrary, the prosecutor made it plain that he was not making any such contention. It was brought out and first exhibited on the re-direct examination of the police surgeon. The latter, upon cross-examination by appellants' counsel, testified that the injuries sustained by Lawson could not have been inflicted with the bare fist without injury to the hand or arm of the assailant; that none of the appellants exhibited a hand or arm injury. The shock pad was used to illustrate how Lawson's injuries could have been inflicted without injury to the assailant's hand or arm.

The general rule seems to be that it rests within the sound discretion of the trial court as to the extent that weapons and implements, not used to commit the crime, may be exhibited and used by the prosecuting officer by way of illustration. 16 C. J. 894; *State v. Simmons,* 78 Kan. 852, 98 Pac. 277; *People v. Cox,* 76 Cal. 281, 18 Pac. 332; *Hinton v. Commonwealth,* 134 Ky. 511, 121 S. W. 434; *State v. Duncan,* 116 Mo. 288, 22 S. W. 699; *Peoples v. Commonwealth,* 147 Va. 692, 137 S. E. 603.

We, however, have held that weapons not used in the commission of the crime are not admissible in evi-

dence. *State v. Lloyd*, 138 Wash. 8, 244 Pac. 130; *State v. Hiatt*, 187 Wash. 226, 60 P. (2d) 71. While we have no intention of departing from the rule laid down in those cases, we think the exhibition of the shock pad in this case presents an exception to the rule. Counsel for appellants, in showing on cross-examination of the police surgeon that appellants could not, with their bare fists, have inflicted the injuries sustained by Lawson, without sustaining injury themselves, made the opening for the prosecutor to show, on re-direct, how they could have inflicted the injuries to Lawson without injury to themselves.

Furthermore, the shock pad was not admitted in evidence. Concerning its use, the court instructed the jury as follows:

"During the course of the trial one of the deputy prosecuting attorneys, representing the state, produced before the jury, and handed to one or more of the witnesses, a certain glove and a leather-bound 'shot-pad' or 'knuckle-pad.' This pad was marked for identification as 'State's Exhibit for Identification No. 15,' but when it was offered in evidence by the state the court sustained an objection thereto and refused to permit its introduction in evidence as an exhibit.

"In this connection, you are instructed that there is no evidence whatever connecting any one of the defendants with the possession or use of said articles. Their production at the trial was only permitted by the court for the purpose of illustrating and clarifying the oral testimony of witnesses as to what type of instrument could have caused the alleged injuries to Berry Lawson. You are therefore instructed to totally disregard the fact that these articles were displayed to you except for that one purpose. The prosecuting attorneys concede that there is no evidence whatever tending to show that any one of the defendants had or used said articles at the time of the alleged offense."

In the light of this instruction and the circumstances under which the shock pad was brought into the case,

we do not think the exhibition of it before the jury constituted reversible error. Appellants complain that the above quoted instruction amounted to a comment on the evidence. We think this assignment is without merit.

■ The next contention made by appellants is that the state's attorneys, in their arguments to the jury, commented upon the failure of the appellants to testify. All of the statements called to our attention under this assignment were of the character discussed and held not to violate a defendant's constitutional rights in *State v. Litzenberger,* 140 Wash. 308, 248 Pac. 799.

■ Appellants next except to two instructions given by the court, relating to the responsibility of each of the appellants for the acts of the others. One instruction was substantially in terms of the statute (Rem. Rev. Stat., § 2260). The other was in accord with the rule stated in *State v. Nichols, supra,* where we said:

"Here the three boys were engaged in a common escapade. All were immediately at the scene of the crime. The breaking by one was the act of each, so far as the matters of pleading and proof are concerned. All of them were principals."

The instructions complained of correctly stated principles of law applicable to the facts disclosed by the evidence.

■. The next assignments of error are directed to four instructions dealing with manslaughter as an included offense. Without undertaking to recapitulate the argument made in support of these assignments, we may say that we think it was highly proper to submit manslaughter as an included offense, under the facts as established by the evidence. We think the jury were warranted in finding an absence of intent to kill, and even an absence of intent to inflict grievous bodily

harm. They were justified, under the evidence, however, in finding that appellants used more force than was necessary in taking Lawson into custody, and that they inflicted the injuries which caused his death. In the absence of justification or excuse, this constitutes manslaughter. See *State v. Cooley*, 165 Wash. 638, 5 P. (2d) 1005; *State v. Foley*, 174 Wash. 575, 25 P. (2d) 565.

Appellants next complain of instruction No. 18. In this instruction, the court advised that, if an officer uses more force than is reasonably necessary in making an arrest, and kills a person, he is guilty of manslaughter; and if, in using such unnecessary force, the officer wilfully inflicts grievous bodily harm, causing death, he is guilty of second degree murder. The objection to the instruction seems to be that it does not carry the qualification that what is reasonable force must be determined from the viewpoint of the officer at the time of making the arrest. The court gave six instructions dealing with this subject in its different phases under the evidence. When read as a whole, these instructions contain a correct statement of the rights and responsibilities of appellants with respect to the use of force in making the arrest. There is no merit to the claim of error in the giving of instruction No. 18.

The next assignment of error is directed to the refusal of the court to give appellants' requested instruction No. 40, reading as follows:

"If, upon a fair and impartial consideration of all the evidence in this case, you should find that there are two or more reasonable theories supported by the testimony and evidence and that one of such theories is consistent with the guilt of any of the defendants and that any of the other such theories is consistent with the innocence of any of the defendants, then it is the policy of the law and the law makes it your duty to adopt the

theory which is consistent with the innocence of the defendant and in such a conclusion to find the defendant or all of the defendants not guilty as your judgment may conclude."

We think the substance of the request was adequately covered in the instruction numbered 20, given by the court. It was not error to refuse to give requested instruction No. 40.

Appellants next complain of the court's refusal to give their requested instruction No. 51, which reads as follows:

"The defendants as police officers are public officers, and the presumption is that they were doing their duty unless such presumption is overcome by evidence sufficient to convince the minds of the jury."

The request, as an abstract statement of law, is correct. But we think the court adequately defined appellants' rights and duties as officers in instruction No. 18 and the five kindred instructions, which we have already discussed. It was not error to refuse to give appellants' requested instruction No. 51.

Appellants next urge that the court erred in refusing to give their requested instruction No. 58. This instruction was directed to the credibility of the witness Lenora Johnson, and is predicated on the assumption "that there is uncontradicted testimony in this case tending to prove that the state's witness, Lenora Johnson, is a prostitute." The evidence, if any, of the fact was not uncontroverted. The witness herself denied it. It was not error to refuse to give the instruction in the form requested.

Finally, appellants charge the state's attorney with a course of misconduct running throughout the trial. We have examined the portions of the colloquies between counsel and the arguments of the state's attorneys wherein it is claimed there were instances of

misconduct. The case was vigorously prosecuted and defended. There is manifested throughout the record a certain amount of acerbity in the attitude of counsel toward each other. But we do not think the instances of misconduct charged to the state's attorneys, either singly or cumulatively, were so prejudicial as to call for a reversal. Viewing the record as a whole, we are convinced that appellants had a fair trial.

Judgments affirmed.

STEINERT, C. J., MAIN, HOLCOMB, and MILLARD, JJ., concur.

