[No. 27877.   Department One.   July 5, 1940.]

THE STATE OF WASHINGTON, *Respondent,* v. QUIN
GALLAGHER, *Appellant.*[1]

[1]Reported in 103 P. (2d) 1100.

*Guy E. Kelly* and *John E. Gallagher,* for appellant.

*Thor C. Tollefson* and *Hugo Metzler, Jr.,* for respondent.

MILLARD, J.—The defendant was charged with the crime of murder in the first degree, in that, on or about the first day of August, 1938, the defendant

" . . . did then and there being unlawfully and feloniously with the premeditated design to effect the death of Arthur W. Nelson, a human being, kill and murder the said Arthur W. Nelson, by shooting the said Arthur W. Nelson with a pistol loaded with powder and ball, which he, the said QUIN GALLAGHER then and there had and held in his hand and thereby mortally wounding the said Arthur W. Nelson, from which said mortal wounds the said Arthur W. Nelson did languish, and languishing, died upon August 18, 1938."

The trial resulted in a verdict finding the defendant, who pleaded self-defense, guilty of the charge of manslaughter. Motions in arrest of judgment and for a new trial were denied, and from the judgment and sentence committing him to the county jail for a period not to exceed one year, the sentence to be subject to suspension after a period of six months, the defendant appealed.

The facts are as follows:

Appellant, who was sixty-two years of age at the time of the tragedy, is sixty-four inches in height and weighs one hundred and fifteen pounds. For the past eight years, he has maintained under lease from the port of Tacoma a runway for private mooring of yachts and small boats. He maintains a shop at this point to enable him to repair and paint the private boats using his facilities. He was assisted in his business by his wife and one employee, named John Larson. The Gallaghers lived in a four-room house at this runway,

the front room of which residence was used as an office.

Arthur W. Nelson was employed by the city of Tacoma as a pilot on a fireboat owned by the city. He was forty-two years of age at the time of his death, weighed approximately two hundred pounds and was six feet in height. When he was not on duty, he and another fireman named Mathews went to Gallagher's float, where they performed work on a private boat berthed at that place.

Appellant told Mathews that Nelson was "chiselling on his business," and made other statements to the effect that Mathews and Nelson were depriving appellant of work. Those statements were communicated by Mathews to Nelson, who, about five o'clock the evening of August 1, 1938, called at appellant's office at the float. Appellant was then sitting at his desk in the front room, which was used as an office.

Nelson's inquiry, in rather rough language, addressed to appellant concerning the misunderstanding or objection of appellant to Nelson's use of the float, was answered by appellant with the order to get out of the office. Nelson refused to do this, accompanying the refusal with the statement that it would take a larger man than appellant to eject him. Appellant then repaired to his kitchen, where he armed himself with a stick or club, which had been used as a hammer handle. He returned to the office, or front room, and ordered Nelson "to get out of here," and endeavored to hit Nelson with the stick. Nelson took the stick from appellant, who retreated into his dining room, where he was followed by Nelson, who retained possession of the club. Larson and Mrs. Gallagher, who were in the dining room at that time, endeavored to stop Nelson.

Appellant continued to retreat into another room,

where he obtained a .32 caliber Colt revolver, returned to the dining room, where Nelson was struggling with Larson and appellant's wife. The testimony is in conflict whether appellant shot at Nelson once, then Nelson walked toward appellant, who shot again, or whether appellant said, "Nelson you get out of here or I'll shoot," whereupon Nelson threw appellant's wife to one side and thrust Larson in the other direction and started for appellant, who then fired the first shot, which did not stop Nelson. Nelson continued to advance toward appellant, who thereupon fired a second shot. Nelson dropped the stick and asked appellant whether he was shooting blanks.

Nelson did not fall. He turned, left the place, and, accompanied by his son, drove his automobile a distance of approximately one mile, then returned to appellant's house. In the meantime, appellant telephoned for the police, who arrived at appellant's home within a few minutes after Nelson's return thereto. The police escorted Gallagher and Larson to the police station. Nelson was taken to the hospital.

An examination of Nelson disclosed one bullet wound about two inches above his umbilicus just to the right of the midline and radiating downward and outward. The other bullet wound was a couple of inches below the umbilicus to the right of the midline and ranged downward to the left. That is, one bullet entered the upper and the second bullet entered the lower abdomen. The surgeon operated on Nelson about six p. m., August 1, 1938. His condition never improved from the date of his arrival at the hospital. For a few days his condition remained stationary, but peritonitis developed, and his condition gradually grew worse. Nelson died Thursday, August 18, 1938, from general peritonitis as a result of the bullet wounds.

Appellant sought to be absolved on the ground of

self-defense. That is, Nelson took the club from appellant and chased him until appellant's wife and an employee took part in the fight, thereby affording appellant an opportunity to escape Nelson a sufficient length of time in which to arm himself with a revolver, with which, in his fear of Nelson, he shot the latter upon his refusal to depart from appellant's office and home. Nelson's dying statements were to the effect that he did nothing to provoke the assault by appellant with the club or the shooting.

Counsel for appellant first contend that the trial court erred in permitting certain witnesses to relate on the witness stand declarations, "which were substantially all of the evidence for the state in this case," of Arthur W. Nelson, whom the appellant was charged with having killed. It is insisted that the statements of the deceased to the witnesses were inadmissible in evidence as dying declarations, as they fall without the rule that a dying declaration, to be admissible in evidence as such, must have been made by the declarant *in extremis*, and in the belief of impending death after hope of recovery had been abandoned.

About eight days before the death of Nelson, Attorney Johnson called on Nelson who informed Johnson regarding the affray. The foundation for the admission of this testimony is the following:

"Q. What conversation did you have with him when you first entered? A. When I came into the room he said, 'I am glad you are here, I want to tell you what happened before I die,' and I said to him, 'Well, Art, you are not going to die, all you have to do is stick out that Swedish chin of yours and fight a little bit.' He said, 'I am through, I just can't make it.' "

Mr. Mathews, who, at the request of Nelson, called Mr. Johnson to visit Nelson, testified that he visited Nelson each day at the hospital; that, subsequent to the time of conversation of the deceased with Mr. John-

son, Nelson, who at first thought he "was going to get along all right, which we all thought, that he was getting along pretty good," stated after Mathews had completed shaving him:

" 'Dick, I am afraid there is no use,' and I said, 'Why Art, you don't mean to tell me you are going to leave me, are you, are you going to give up?', and he said, 'no,' he said, 'I am going to fight it on through,' he said, and I said 'that's right,' so then he always wanted to relate the story to me."

Mathews further testified:

"A. Well, he told me how he would like to be buried, telling me that he didn't want to go into the ground, he wanted to be cremated and his ashes strewn on Puget sound. Q. That was after Bertil Johnson was in there? A. Yes, sir."

All of the testimony of Mathews as to the declarations of Nelson, which testimony the trial court ruled warranted admission of the testimony of Mr. Johnson respecting declarations of the deceased, was stricken; and the court instructed the jury to disregard any statement "with reference to this witness."

The foundation laid for the admission of the testimony of Mr. Ducommun, on the subject of the declarations of the deceased, was as follows:

"Q. Mr. Ducommun, what did Arthur Nelson tell you when you first got there, did he make any statement about his physical condition? A. Well, after he greeted us he said, 'Les,' he says, 'I am not going to make it,' he says, 'I had Bert up here this afternoon fixing up my papers,' he says 'I feel now I am not going to make it.' "

This was corroborated by Mrs. Ducommun, who accompanied her husband to the bedside of Nelson. Another witness permitted to testify to the declarations of Nelson, was his nurse, Miss Margaret Anderson. The foundation for her testimony was as follows:

"Q. I want to ask you while you were there as a nurse, did, at any time Mr. Nelson express any—make any statement to you about his physical condition relative to death? A. Yes. Q. Can you fix that time for the jury, was that before Bertil Johnson was there or on the same day or after? A. It was after he was there. Q. It was after he was there? A. Yes, sir. Q. What statements did Mr. Nelson make to you relative to this subject? A. Well, let's see. I was on duty from seven in the morning until three in the afternoon and he became worse, his condition became worse and I had to give him stimulants and oxygen and after that he kind of snapped out of his bad spell and made the statement that he didn't think he was going to make it next time. Q. Next time, what do you mean? A. Well, evidently the scare he had had, that he was very bad and he realized it and if he had it again why he didn't expect to come out of it. Q. Tell me what you mean by if he had it again? A. Well— Q. (interposing) Are you referring to the oxygen? A. Yes, referring to the oxygen and the stimulants. His condition became very much worse. Q. He was conscious of that fact? A. Yes, sir. Q. You attended him all the time that he was there? A. I was on from seven in the morning until three in the afternoon up until the time he died. Q. Now, in your opinion at the time he made this last statement to you, do you believe that he was fully conscious of the fact that he was going to die? . . . A. Yes, I think he knew. Q. He knew? A. Yes, what he was saying. Q. Now, after he knew that he was going to die, did he ever relate any incidents relative to this shooting down at Gallagher's float? A. He told me a little but I stopped him from talking because his condition was so weak."

In *State v. Bridgham,* 51 Wash. 18, 97 Pac. 1096, it was contended that a written statement should not have been admitted as the dying declaration of the deceased for the reason that there was nothing upon the face of that declaration disclosing that the deceased realized at the time that she was about to die or that her death was imminent and impending. It was

further argued that the evidence introduced in connection with the statement did not show that the deceased said she was about to die or that her death was imminent and impending. In our opinion in that case, we said:

"The standard required for the admissibility of the declaration is that the declarant should have believed that she was about to die, that she made the declaration under the belief that she would not recover, and that she did die of the illness from which she was suffering as the direct and proximate result of the original injury which the declaration tended to illustrate. *State v. Power*, 24 Wash. 34, 63 Pac. 1112. It was not necessary that the written statement should contain the express declaration that the declarant believed she was about to die, and it was not necessary to show by other testimony that she actually used the words. It was sufficient to show, either by the statement itself or by other credible testimony, such statements or circumstances as would convince a reasonable mind that the declarant believed at the time that she was *in extremis.* The testimony showed that the deceased was informed by a physician that her wound was mortal and that she could not live; that she was rational and realized she could not live; that she said she did not think she could get well, and she expressed the wish that her son would look out for her three babies; that she said her daughter's ashes were in a jar in her trunk and she wanted them buried with her. We think it was clearly shown that the declarant made the statement under the belief that she was about to die, and her death soon followed."

See, also, *State v. Mooney*, 185 Wash. 681, 56 P. (2d) 722.

It is clear that the facts and circumstances attending the making of the declarations in question were such as to bring those declarations within the rule stated above. His statement to witness Johnson that "I am through, I just can't make it," and his statement to witness Mathews a week or less subsequent to his con-

versation with witness Johnson to the effect that he desired cremation and that his ashes be tossed into the sound, despite his statement to witness Mathews that he intended "to fight it through," disclosed a settled hopeless expectation of death from the wound inflicted upon him by appellant, but that he would continue to resist the approach of the Grim Reaper. The nature of the wounds was such that surely Nelson must have realized the situation, in view of which he was conscious of approaching death.

Mr. Nelson was not advised by his physician that death was imminent. He did not call for a spiritual advisor, and he failed to have his family gather at his deathbed. He did not express a desire to make a will, and he did not die until eight days after his conversation with Mr. Johnson. Those facts do not, as counsel for appellant insist, sustain the contention that the declarations do not conform to the required standard rendering them admissible in evidence.

Mr. Nelson's special nurse testified that, on one occasion subsequent to Mr. Johnson's visit, Mr. Nelson's condition necessitated administering of stimulants and oxygen. When Nelson was revived by these means, he made the statement that "he was not going to make it next time." When the declarations are read as a whole, particularly in the light of the testimony of the special nurse that she was convinced that Nelson realized he would shortly die, they are sufficient to show that Nelson had abandoned hope of recovery—he was conscious that his doom was certain and would soon occur.

In *State v. Mooney*, 185 Wash. 681, 56 P. (2d) 722, we held that a witness who heard a dying declaration is competent to testify that he thought that the declarant at the time believed that he was going to die and that he could not recover. The fact that the declarant did not die until some days later, did not render the

statements inadmissible in the case cited. The declaration that "I can not make it, it's too tough," was held admissible. The declaration to Mr. Johnson "I am through, I just can't make it," and the declaration of Nelson made in the presence of Mr. and Mrs. Ducommun that "I feel now I am not going to make it," were clearly admissible under the rule that the declarant should have believed that he was about to die, that he made the declaration under the belief that he would not recover, and that he did die of the illness from which he was suffering as the direct and proximate result of the injuries which the declaration tended to illustrate.

We paraphrase the language, as apt in the case at bar, of the opinion in *Shepard v. United States,* 290 U. S. 96, 78 L. Ed. 196, 54 S. Ct. 22, to the effect that the dying are not required to strictly observe all the niceties of speech to which conformity is exacted from a witness on the stand. Not only is the inference permissible—it is conclusive—(and it satisfied, as it ought in reason have satisfied, the trial judge) that Nelson not only believed that the injury he had sustained would result in death, but that the declarations were made under the belief of impending dissolution.

The testimony of Mathews was admissible as a dying declaration. Patently, the statement that "I am going to fight it through," viewed in the light of the further statement that he desired cremation of his body and that he wanted the ashes strewn on the waters of Puget sound, discloses a conviction that, while he would endeavor to recover, Nelson was convinced of his impending demise.

Any error committed by the court, in permitting Mathews to testify as recited above, was cured by the charge to the jury to disregard that testimony. That the jury disregarded the testimony, is reflected in

the verdict convicting appellant of the crime of manslaughter, instead of murder in the first or second degree. The error, if any, was not prejudicial.

It is next contended that the trial court erred in submitting the crime of manslaughter to the jury. Counsel for appellant argue that the theory upon which the information was drawn and upon which the state offered its evidence was that the killing was deliberate. That is, the evidence adduced on behalf of the state was in accord with the information, which charges appellant with the premeditated design to effect the death of Nelson. It is insisted that there is no evidence in the case to indicate that the killing was involuntary or unintentional; that all of the evidence is to the effect that appellant deliberately fired at Nelson when the latter was approaching him; and that the evidence of appellant was presented upon the theory that the killing was in self-defense.

It is, as contended by counsel for appellant, the rule in this state that a defendant may not be convicted of a lesser degree of crime which is included in a greater degree unless evidence is adduced to sustain a conviction upon the lesser degree. The inclusion of the lesser degree within the greater must be an inclusion in fact as well as one in law. *State v. Foley,* 174 Wash. 575, 25 P. (2d) 565.

The rule has no reference to the weight of testimony, but is applicable only to those cases where there is no testimony whatever to weigh tending to show the commission of the lesser degree of crime.

"Conversely, it is also the rule that the lesser degree of crime must be submitted to the jury along with the greater degree, unless the evidence positively excludes any inference that the lesser crime was committed." *State v. Foley,* 174 Wash. 575, 580, 25 P. (2d) 565.

■    Where the killing of a human being is admitted, the killing is presumed to constitute the crime of murder in the second degree. The burden is imposed on the state to raise the charge to murder in the first degree. The defendant has the burden of justifying his act or reducing the charge to manslaughter. *State v. Martin,* 176 Wash. 637, 30 P. (2d) 660; *State v. Foley,* 174 Wash. 575, 580, 25 P. (2d) 565; *State v. Paschall,* 197 Wash. 582, 85 P. (2d) 1046.

■    Appellant, by his plea of self-defense and statement of his purpose, admitted that the killing was voluntary. His attempted justification was apprehension of great personal injury to himself. On his own theory, the appellant was either guilty of murder in the second degree or not guilty. To establish murder in the first degree, it was necessary to prove that appellant, with a premeditated design, effected the death of Nelson. In view of the fact that the evidence does not positively exclude the inference that the lesser crime was committed, it follows that the lesser degree of crime should have been submitted to the jury along with the greater degree.

It is a reasonable inference that appellant did not intend to kill Nelson. While he used a deadly weapon—twice firing a revolver point-blank at the deceased—appellant did not continue shooting when Nelson failed to fall. He permitted his victim to depart under his own power from appellant's premises as recited above. It was for the jury to determine from the evidence whether appellant intended to effect the death of Nelson.

It is unnecessary to cite the numerous authorities, and quote therefrom, sustaining the trial court's submission of the issue of manslaughter to the jury. Any question is foreclosed by our opinions in the recent

cases of *State v. Foley*, 174 Wash. 575, 25 P. (2d) 565, and *State v. Paschall*, 197 Wash. 582, 85 P. (2d) 1046.

Under the evidence, the jury was warranted in finding that appellant used more force than was necessary in attempting to expel Nelson from his home; and that, in the attempted expulsion, he inflicted the injuries which caused Nelson's death. In the absence of justification or excuse, this constitutes manslaughter.

The other assignments of error are without substantial merit.

The judgment is affirmed.

BLAKE, C. J., BEALS, ROBINSON, and SIMPSON, JJ., concur.

[1]Reported in 103 P. (2d) 1095.