[No. 34548. Department Two. August 21, 1958.]

THE STATE OF WASHINGTON, *Appellant,* v. MARSHALL BERRY, *Respondent.*[1]

[1] Reported in 328 P. (2d) 891.

*Arnold R. Zempel* and *Leo J. Gese,* for appellant.

*Dailey & Conroy* and *Joseph H. Brinster,* for respondent.

DONWORTH, J.—Respondent was tried after a plea of not guilty to an information charging him with the crime of murder in the second degree, committed as follows:

"That he, the said Marshall Berry, in the County of Snohomish, State of Washington, on or about the 14th day of April, 1957, while then and there wilfully, unlawfully and feloniously engaged in committing, attempting to commit or in withdrawing from the scene of the commission of a felony, to-wit: assault in the second degree, wilfully, unlawfully and feloniously did shoot into the body of one Ilene Berry, a human being, with a pistol then and there loaded with powder and ball, and then and there had and held by him, the said Marshall Berry, thereby mortally wounding the said Ilene Berry, from which said wounds the said Ilene Berry then and there languished and died on the 14th day of April, 1957."

In its instructions to the jury, the trial court included instruction No. 6, reading as follows:

"You are instructed that manslaughter is the unintentional killing of a human being, done without excuse or justification, by a person while engaged in the commission of an unlawful act not amounting to a felony, or in doing a lawful act in a negligent manner; that in order to constitute manslaughter it is not necessary that it be either premeditated or an intent to kill."

Respondent duly excepted to the giving of this instruction on the ground that there was no evidence in this case to warrant the court's ruling that manslaughter was an included offense under a charge of second-degree murder alleged to have been committed while perpetrating a felony. He contends that he was either guilty of murder in the second degree or not guilty of any crime.

After the jury returned a verdict of guilty of manslaughter, respondent moved for a new trial on several grounds, including the giving of instruction No. 6.

The trial court granted respondent's motion for a new trial on the ground that it had erred in instructing the jury relative to the crime of manslaughter.

The state has appealed from the order granting the new trial, and its four assignments of error raise the single question of law whether, under the evidence in this case, manslaughter was an included offense within the charge contained in the information.

Respondent is, and for many years has been, a sergeant in the United States Air Force. In May, 1952, he and Ilene Berry were married. Each of them had children by prior marriages. In December, 1954, he was transferred to Paine Air Base near Everett. His wife, during a portion of the time between then and her death, on April 14, 1957, worked as a waitress at Northgate. Shortly after coming to Paine Air Base, they purchased a house situated near Lynnwood, to which they brought Mrs. Berry's three children.

In the late fall of 1955, respondent was temporarily transferred to an air force base in Georgia for a few weeks. On his return, he learned that another sergeant, George Futch, had been very attentive to Mrs. Berry. On several occasions thereafter, respondent told Sergeant Futch to keep away from his house and leave his wife alone.

It is not necessary to state in detail all of the unpleasant events which took place during the last eighteen months of Mrs. Berry's life as a result of the existence of this triangle. Suffice it to say that after respondent completed a tour of duty in Greenland, he returned home on March 10, 1957, to find that Futch had been living in his house during his absence. He had, in 1956, commenced suit for divorce, and at the time of the fatal shooting was expecting to obtain a decree on the following day. In fact, he had, two days previously, delivered to his wife a quitclaim deed to their home. At that time, she was undecided whether to marry Futch or to remarry respondent after the divorce decree became effective.

With the foregoing brief background in mind, we now come to the events which immediately preceded the fatal shooting of Mrs. Berry.

On Saturday, April 13, 1957, respondent drove his wife to work. She informed him that she had a date with "the girls" after work and that it would not be necessary for him to

pick her up. Apparently she did not go out with the girls, because respondent walked into the Corner Tavern at Lynnwood about 10:30 that evening and found Sergeant Futch and Mrs. Berry there together.

Respondent was then returning from a party in Seattle, and no words were exchanged between him and his wife except for a possible casual greeting. Respondent then went to the NCO club at the Paine Air Base, where he discussed his domestic difficulties with other servicemen friends. This discussion took place at the bar, where respondent had three or four drinks. He left the club about 1:45 a. m. on April 14th.

Meanwhile, Sergeant Futch and Mrs. Berry left the Corner Tavern and went to her home. After putting the children to bed, at about eleven o'clock, they drove to a roadhouse, and, after eating, returned to the Berry home.

Both respondent and Sergeant Futch testified at the trial concerning the homicide, which occurred about 2:00 a. m. on April 14th. While respondent denied certain portions of Sergeant Futch's testimony, particularly that he ever threatened to kill him with his pistol, their versions as to the manner in which Mrs. Berry was fatally wounded are not materially different.

Sergeant Futch's version was substantially as follows:

While Mrs. Berry and Sergeant Futch were in the kitchen of the Berry home, respondent drove into the yard, parking his car behind the car Mrs. Berry and Sergeant Futch had used. Whether he left the lights of the car on and whether the motor was left running, a deputy sheriff, who arrived after the shooting, was not positive.

Mrs. Berry said to Futch, "George, it's Berry." Respondent entered the back door with a gun in his hand, which he admitted belonged to him. It was a .32 caliber pistol which he always carried in his glove compartment.

Respondent was in a state of jealous rage and was highly excited. He pushed his wife aside and confronted Futch with the gun, saying, "I'm going to kill you, you ............................ Where do you want it?" He then shoved Futch toward the

back door of the house. Mrs. Berry attempted to seize her husband, but he pushed her back into the kitchen.

Futch and respondent went through the back door, and the latter pushed the former down the steps. While he was standing on the top step, respondent fired the first shot. The muzzle blast was to the left of Futch's shoulder.

Respondent reached the ground and fired another shot, which did not hit anyone. Respondent continued to threaten to kill Futch and gradually forced him from the house out to the gate of a picket fence which separates the yard from the concrete driveway. Between the back steps and the fence, respondent fired a third shot in Futch's direction. Mrs. Berry accompanied the two men, pleading with her husband to let Futch leave the premises and to allow her to move her husband's car so that Futch could drive off. She said that the matter "had gone too far for somebody to get killed over." But the husband only answered with a vile statement. She then turned and walked toward the back door.

Respondent fired a fourth shot, the muzzle blast being felt between Futch's legs. Respondent continued hurling foul words at Futch, who, fearing for his life, made a lunge for respondent's gun and caught hold of his wrist. His body was in full motion, causing Berry to turn. A fifth shot was fired, which struck Mrs. Berry and caused her death almost immediately.

The momentum of Futch's grab for the gun had caused both men to lose their balance, and a struggle took place across the picket fence. Futch saw that Mrs. Berry had been hit and, after some persuasion, both men relaxed their hold on one another and went to where Mrs. Berry lay mortally wounded.

On cross-examination of Sergeant Futch by respondent's counsel, he said that the shooting of Mrs. Berry was accidental. His testimony was as follows:

"Q. George, now you were in on this grappling and wrestling match, or whatever it was there, at the time this gun went off and the bullet went astray and hit Ilene: did it appear to you to be quite accidental the way the shot went over and hit her? A. I would say that the shot was

intended for me, in my opinion, and in my momentum of twisting him when I hit his arm that had the gun, it carried the shot in that direction, and that the actual hitting of her was accidental, yes. Q. Would your holding of his hand have anything to do with the aim of the bullet? A. It would have something to do with the general direction the bullet went into, yes. Q. He never did succeed in getting loose from you actually once you got ahold of him, until you chose to let loose of him, isn't that right, George? A. That's correct."

Respondent's testimony (both on direct and cross-examination) regarding what happened from the time he arrived at the Berry house until his wife was killed is too long to be quoted in full. The portion of his direct examination as to the manner in which the fatal shot was fired is as follows:

"Q. . . . As you approached this gate, will you tell us what happened from then on? Just tell your story. Just tell us what happened, as you remember it, Sergeant. A. Well, as we went out on the driveway, I insisted on him again getting in his car and leaving, and George grabbed me, and he grabbed me with his hand that way (illustrating), grabbed the hand that I had the gun in.

"First, he grabbed ahold of my wrist, then his hand slipped up around my hand, and the gun went off approximately twice while we were fighting over the gun.

"Then my back was towards where Ilene was found laying first; that is, where we first found her laying, my back was towards her, and his face was towards where my wife was found laying. We were standing there struggling over the gun, and I can't recall the positions that we were in—I mean, my arm was in—all the time that he was twisting it and turning it. I can't recall the position. But the gun went off at least twice during that struggle.

"But when George told me 'Ilene is down', he thought she was hurt, my back was towards my wife, and I looked back and saw my wife laying on the ground, and I told George to turn loose of the gun. And which he did. And then we ran over towards where she was laying. Q. What did you do with the gun, do you know? A. As soon as George turned the gun loose, I put it in my pocket. Q. Why didn't you shoot him then, do you know? A. Because I never had any intentions of shooting him to start with. . . . Q. Did you ever intend to shoot your wife at any time, Sergeant Berry? A. No, sir. Q. You didn't even see

her at the time that she was shot, is that right? A. No, sir. That's correct, sir, I did not. Q. Did you have control of that gun when it went off one or two times when you were wrestling? A. No, sir. I can't say that I had control of it because George Futch had his hand on my hand, and was twisting it."

On cross-examination, respondent again told of the situation which led to his wife's death as follows:

"Q. Now, when you came out of the gate where did you go then, and where did he go? Did he stand there? Is that where he grabbed the gun? A. When we went outside the gate, between the fence and the car, I repeatedly would tell him to get in his car and leave, and he wouldn't leave, and he said,—then I recall he said, 'You move your car, and then I'll leave'.

"I told him, 'George, I don't need to move my car. You can back out around it'.

"And he said, 'Well, I'm not going to leave until you do, until you move your car I'm not leaving'.

"Q. I think you testified that your wife,—that you don't know if your wife was out there at all that night or not while you were struggling, is that correct? A. I don't recall seeing my wife at all after I pushed her back in the house. Q. You don't recall that she was out while you were struggling? You didn't know she was there? A. What I mean is, I never saw her in front of me. My back was always to the kitchen door, and I did not see her in front of me. In other words, she must have been behind me all the time. That is the reason I don't remember seeing her. Q. Do you recall her saying to you, that she would move the car? A. No sir. Q. Did you fire any shots as you were going down this walkway? A. Yes sir. Q. Where did you fire those? A. I fired one shot over George's head again, and one into the ground. Q. And the ground was at his feet, was it, right at his feet? A. I fired the shot approximately this far off of his left leg, if he was standing right here, I shot the gun over here (illustrating). Q. You don't recall asking him where he wanted it, if he wanted it, as he said, in the guts or in the back? Do you recall that? A. No sir. Q. Where did you have the gun? What position did you have the gun in when he grabbed your wrist, Mr. Berry? A. I don't recall if the gun was up here or down here (illustrating). I don't recall where it was. Q. You don't recall where you had your gun handle then? A. I may have had it down here, or

I may have been holding it out like this, or over here, I don't recall the exact position. Q. You wouldn't have any reason to have your hand up like this, would you (illustrating)? A. That's what I say, I don't remember where I had my hand, whether it was hanging down by my side or over here, I don't remember. I know that at no time did I ever have the gun in George's stomach, or anything like that. Q. But you had the gun pointed at him though, didn't you? A. No sir. Q. You had the gun pointed at him though, didn't you? A. No sir. Q. What did you do? Did you have it always to one side of him? A. Yes sir. Q. When he grabbed it then, you don't know what position your hand was in? A. (No response) Q. Am I talking loud enough, Mr. Berry? A. I am sorry, sir, I am a little bit hard of hearing. Q. I will talk a little bit louder then and a little slower. You don't remember then what position you had this gun, or what position your arm was in when he grabbed your wrist, is that right? A. No sir. I didn't have it in his stomach, I know that, because I kept the gun down all the time. I never pointed the gun directly at him. . . . Q. Were you affected any at all by the liquor that you drank, Mr. Berry? A. If the prosecutor is implying that I was drunk, no sir. Q. No, I am not. I am not doing that at all. I am not implying that. I am not inferring that. I just want to know if you felt any exhilaration at all from the liquor, or if it affected you at all? A. I can't remember if I was affected, if I felt any effects from the drinks, I can't remember that."

■ From respondent's own testimony, there was sufficient evidence to warrant the trial court's giving instruction No. 6, which submitted to the jury the issue of whether or not he was guilty of the lesser included offense of manslaughter.

■ Under RCW 10.61.010, the jury in such a case may find the defendant guilty of a lesser degree of the crime charged in the information. Apparently, the jury believed the evidence relating to the crime of manslaughter as defined in instruction No. 6 and found respondent guilty thereof. Under the evidence in this case, the trial court did not err in giving instruction No. 6. See *State v. Gallagher,* 4 Wn. (2d) 437, 103 P. (2d) 1100 (1940).

Respondent does not attempt to distinguish or comment upon the several decisions cited by appellant in its brief

relating to convictions of lesser degrees of the offense charged in the information. We, therefore, need not analyze them separately since they support the result we have reached here.

Respondent further urges that the order granting the new trial was correct because of four additional errors of the trial court: (a) refusing to hold that the information charged only second-degree murder and would not be understood by a person of common understanding as including manslaughter; (b) the court's admission of a gruesome photograph of the deceased; (c) the court's comments regarding two photographs not admitted in evidence, and (d) the court's rulings when Sergeant Futch invoked the fifth amendment on direct and cross-examination.

We have examined the record and cannot find that the trial court erred to respondent's prejudice in regard to any of these matters.

Being of the opinion that the trial court erred in granting respondent a new trial, the order appealed from is reversed with directions to impose sentence upon respondent according to law in conformity with the verdict of the jury.

HILL, C. J., WEAVER, ROSELLINI, and OTT, JJ., concur.