[No. 30238. Department Two. October 9, 1947.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH HENRY
MAISH, *Appellant*.[1]

*Schaefer & Hall,* for appellant.

*R. DeWitt Jones* and *Dale W. Read,* for respondent.

JEFFERS, J.—On December 23, 1946, defendant, Joseph
Henry Maish, was, by an information filed by the prosecut-
ing attorney for Clark county, charged with the crime of
murder in the first degree, committed as follows, to wit:

"That he, the said Joseph Henry Maish, did, in the county
of Clark, state of Washington, on or about the 21st day of
December, 1946, while in an attempt to commit rape, and
while withdrawing from the scene of a burglary, did unlaw-
fully and feloniously kill a human being, namely, LaDonna
Toscas, by then and there stabbing her with a knife about
the throat and back inflicting wounds which were the im-
mediate and proximate cause of her death which occurred
on the 21st day of December, 1946."

'Reported in 185 P. (2d) 486.

Defendant was duly arraigned on January 31, 1947, and, being personally present in court and represented by counsel, entered an oral plea of not guilty to the information, and, in addition, filed the following written plea:

"Comes now the defendant herein in open court by and through his undersigned attorneys of record, and in addition to the plea of not guilty, files herein his plea as follows:

"(1) That at the time and place of the commission of the crime charged, the said defendant was insane or mentally irresponsible.

"(2) That said insanity or mental irresponsibility still exists.

"(3) That at said time and place of the commission of said act charged, the defendant was motivated by an irresistible impulse."

The cause came on for hearing before the court and jury on March 24, 1947. Many witnesses were sworn and exhibits introduced on behalf of both the state and defendant.

While defendant did not take the stand, three statements made by him were introduced in evidence without objection. Two of these statements were made to police officers of Vancouver the night of the alleged murder, and the third was made to a juvenile officer the morning after the killing, or on December 22, 1946.

At the close of the case, the court gave to the jury, among others, the following instructions:

"Instruction No. 6: In addition to the general plea of 'Not guilty', the defendant has interposed a special plea setting up that at the time and place of the commission of the crime charged, the said defendant was insane or mentally irresponsible, and that said insanity or mental irresponsibility still exists.

"The burden of proving this special defense rests upon the defendant and the measure of proof required of him in this respect is proof by a fair preponderance of the evidence. Unless the defendant proves this defense to you by a fair preponderance of the evidence the defendant is presumed to be sane and mentally responsible and to intend the natural and usual consequences of his own acts."

"Instruction No. 10: With regard to defendant's plea that he was insane or mentally irresponsible at the time of the commission of the act charged against him, you are in-

structed that it will be your duty to find him not guilty by reason of such insanity or mental irresponsibility if you find from the evidence that at that time he did not have the ability to distinguish between right and wrong with respect to that act. If you find that his mind was so deranged and disordered that he did not have the mental power to choose between right and wrong with respect to that act and that such mental disorder or defect was the efficient cause of his act and that he would not have committed the act but for that affection, then he is not responsible in law and should be acquitted.

"You are cautioned, however, that one who is otherwise sane will not be excused from a crime he has committed while his reason or will power are temporarily suspended not by an inherent defect or disorder of the mind but by anger, fear, lust, or other passion. So-called emotional insanity will not excuse a crime."

■ No exceptions to the above instructions were taken by defendant, nor in fact to any of the instructions given, and it follows that such instructions became the law of the case on the issues covered by them.

Defendant requested the trial court to give the following instruction on his theory of irresistible impulse:

"You are instructed that if you believe from the evidence that at the time of committing the acts charged in the information, the defendant was suffering from such a perverted and deranged condition of his mental faculties as to render him incapable of distinguishing between right and wrong, or unconscious at such time of the nature of the act charged in the indictment while committing the same, or where although conscious of them and able to distinguish between right and wrong, and to know the acts were wrong, yet his mind and his will the governing power of his mind was, otherwise involuntarily, so completely destroyed that his action was not subject to it but beyond his control, it will be your duty to acquit the defendant, and in such case your verdict shall be not guilty."

The trial court refused to give the requested instruction.

On March 28, 1947, the jury returned a verdict of guilty as charged and, by a special verdict, ordered the death penalty to be imposed.

A motion for new trial was made by defendant and denied, and, on April 7, 1947, judgment and sentence was pronounced and filed, in accordance with the verdict and special verdict.

Defendant has appealed from the judgment entered, and his only assignment of error is that the court erred in refusing to give the requested instruction.

Rem. Rev. Stat., § 2108 [P.P.C. § 121-21], provides:

"There are but three pleas to the indictment or information: A plea of,—

"1. Guilty;

"2. Not guilty;

"3. A former judgment of conviction or acquittal of the offense charged, which may be pleaded with or without the plea of not guilty."

There is also what might be termed a fourth plea. Rem. Rev. Stat., § 2174 [P.P.C. § 133-3], provides:

"When it is desired to interpose the defense of insanity or mental irresponsibility on behalf of one charged with a crime, the defendant, his counsel or other person authorized by law to appear and act for him, shall at the time of pleading to the information or indictment file a plea in writing in addition to the plea or pleas required or permitted by other laws than this, setting up (1) his insanity or mental irresponsibility at the time of the commission of the crime charged, and (2) whether the insanity or mental irresponsibility still exists, or (3) whether the defendant has become sane or mentally responsible between the time of the commission of the crime and the time of the trial. The plea may be interposed at any time thereafter, before the submission of the cause to the jury, if it be proven that the insanity or mental irresponsibility of the defendant at the time of the crime was not before known to any person authorized to interpose a plea."

Rem. Rev. Stat., § 2175 [P.P.C. § 133-5], provides for a special verdict on acquittal when a plea of insanity is interposed, and § 2176 [P.P.C. § 133-7] provides for special verdicts.

These statutes were all followed by the trial court in the instant case.

■ It is apparent that our statutes do not specifically recognize the plea of irresistible impulse as a separate and distinct defense to a criminal act. However, in the cases where this defense has been raised, it seems to have been injected into the case under the plea of insanity; in other words, that the irresistible impulse is induced by and grows out of some mental disease.

Irresistible impulse is defined by 14 Am. Jur. 793, § 35, as follows:

"Irresistible impulse as recognized by the courts is an impulse induced by, and growing out of, some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it. It is to be distinguished from mere passion or overwhelming emotion not growing out of, and connected with, a disease of the mind. Frenzy arising solely from the passion of anger and jealousy, regardless of how furious, is not insanity."

Theoretically, at least, the first part of the above definition is the basis upon which the defense has been recognized and accepted in some jurisdictions.

Appellant begins his argument by quoting from Weihofen on Insanity as a Defense in Criminal Law, at p. 44, as follows:

" 'All courts agree that knowledge of right and wrong is a correct test of responsibility, and that a person so mentally disordered as to be incapable of knowing that a particular act is wrongful, should not be punished for committing it. The question upon which courts differ is whether this is the only test. The majority of states hold that it is, and that a person who was incapable [capable] of knowing the wrongfulness of a given act is accountable to the law if he commits it. A large minority, however, hold that this test is not sufficient in all cases, and that a person who knew he was committing an act which was morally wrong and prohibited by law may nevertheless be excused from responsibility if he lacked the power of conscious volition and inhibition (freedom of will) to resist the impulse to commit it.' "

Appellant continues to quote from Mr. Weihofen, a part of his quotation being as follows:

" 'The states which accept irresistible impulse as a defense to crime simply apply this general rule of law to the case where the lack of free will to govern and control actions is the result of mental disease.' "

Appellant states on p. 26 of his brief:

"This writer [Weihofen] lists Washington in the doubtful, or undecided, category, and we quite agree with this author that the decisions of the supreme court of this state to date leave the matter of this test in doubt."

Appellant cites three cases from this state, namely, *State v. Hawkins,* 23 Wash. 289, 63 Pac. 258; *State v. Craig,* 52 Wash. 66, 100 Pac. 167; *State v. Schafer,* 156 Wash. 240, 286 Pac. 833.

Appellant admits that in the *Craig* case the defendant did not rely upon irresistible impulse as a defense, and, of course, he could not do otherwise, for in the opinion we stated:

"Appellant did not rely upon irresistible impulse as a defense; it was not before the lower court and is not before us."

Appellant apparently seems to be of the opinion that, because of the· statement last above made, this court might have considered the defense of irresistible impulse had it been properly presented. However, we think the following language of the opinion, which follows the above-quoted portion, indicates to the contrary:

"When a jury of laymen are invited to go further than to answer the question, had the accused sufficient capacity at the time of committing the act to distinguish between right and wrong with reference to it, they are invited to enter the realm of speculation where even the opinion of the alienist is met by like opinion, and he can find no guide to clear his doubt or direct him toward a truthful verdict."

It is also admitted by appellant that, in the *Craig* case, we announced the test to be:

"Had the accused sufficient capacity at the time of committing the act to distinguish between right and wrong with reference to it?"

In *State v. Schafer, supra,* cited by appellant, the accused was charged with murder. He entered a plea to the effect that, at the time of the alleged commission of the crime

charged, and for a long time prior thereto, he was mentally irresponsible and criminally insane, and that the mental irresponsibility and criminal insanity still existed. The opinion states:

"While it seems to be fairly well established by the affidavits in the record that appellant was subnormal [affidavits in support of a motion requesting the court to appoint a commission to inquire into the insanity of the accused] and was of the mental age of nine years, his ability to distinguish between right and wrong is the test of sanity or insanity in criminal law."

The opinion continues:

"Insanity in law covers nothing more than the relation of the person and the particular act which is the subject of judicial investigation. *The legal problem must resolve itself into the inquiry whether there was mental capacity, or moral freedom, to do or abstain from doing the particular act.*" (Italics ours.)

Appellant, in the case at bar, after quoting that part of the above statement which is italicized, states:

"This expression, therefore, in our opinion opens the door to the theory of irresistible impulse as a defense, and therefore the sole test to be applied is not the test of whether or not the defendant knew at the time of the act the difference between right and wrong."

We are unable to believe that, by the language last above quoted from the *Schafer* case, this court intended to depart from the right and wrong test thereinbefore announced.

Appellant also states in his brief:

"The matter of irresistible impulse as an excuse for crime is thoroughly annotated in 70 A. L. R. commencing at page 659, and the history of this theory is discussed from its beginning and the cases annotated. It is interesting to know that on page 665 of 70 A. L. R. Washington is listed as having recognized the doctrine of irresistible impulse, and cites the case of *State v. Hawkins*, 23 Wash. 289, 63 Pac. 258."

We have read the above article and many of the cases cited. We are unable to agree that there is anything in the last-cited case which would justify the statement that this

court has accepted or approved the defense of irresistible impulse.

In the cited case, the accused was convicted of the crime of murder and sentenced to death. The opinion states that the principal defense was that appellant was irresponsible by reason of his having been under the influence of intoxicating drinks and drugs which had been administered to him. The trial court gave an instruction on voluntary drunkenness. The court also, by instructions Nos. 10 and 11, instructed the jury on the defense of insanity. Error was assigned upon the giving of the two instructions last referred to. The opinion states:

"It is a dangerous thing for a court to interject into a cause, by an instruction, an issue which was not raised by the pleadings or by the testimony in the case, and we have searched this record in vain for any testimony bearing upon the question of insanity."

The judgment was reversed and a new trial granted, because the court had erroneously given instructions Nos. 10 and 11 relative to the defense of insanity.

Appellant cites no other cases from this state, and we have been unable to find any, which it could be contended in any way refer to the defense of irresistible impulse, and, so far as we have been able to determine, the right and wrong test, as stated in *State v. Craig* and *State v. Schafer, supra,* is the test which has been applied by this court.

We are of the opinion, therefore, that this court has never recognized or approved the defense of irresistible impulse, nor do we now feel that we should accept the doctrine of irresistible impulse as a defense in a criminal action.

We have read many cases from other jurisdictions which seem to have accepted the irresistible impulse theory; and they are generally based upon the theory that, in order to constitute a defense to a criminal act, the irresistible impulse must be one induced by, and growing out of, some *mental disease* affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged

against him, and to perceive that it is wrong, is unable, because of such *mental disease,* to resist the impulse to do it. From the many jurisdictions which have rejected the theory of irresistible impulse as a defense to a criminal act, we have selected a case from West Virginia and one from Maine, which, in our opinion, set out the danger of this theory and the difficulty of a practical application of it.

The first case from which we desire to quote is *State v. Harrison,* 36 W. Va. 729, 15 S. E. 982, 18 L. R. A. 224. We realize that this is not a late case, but a reading of the opinion will reveal that practically all the theories which are advanced in the later cases in support of the irresistible impulse doctrine were discussed in the cited case, and, in addition, the decision in the cited case was approved in *State v. Beckner,* 118 W. Va. 430, 190 S. E. 693, wherein the *Harrison* case was referred to as the leading case in West Virginia.

In the *Harrison* case, *supra,* Allen Harrison had received the death sentence for the murder of one Bettie Adams. The court discussed the irresistible impulse defense as follows:

"This 'irresistible impulse' test has been only recently presented, and, while it is supported by plausible arguments, yet it is rather refined, and introduces what seems to me a useless element of distinction for a test, and is misleading to juries, and fraught with great danger to human life, so much so that even its advocates have warningly said it should be very cautiously applied, and only in the clearest cases. What is this 'irresistible impulse?' How shall we of the courts and juries know it? Does it exist when manifested in one single instance, as in the present case, or must it be shown to have been habitual, or at least to have evinced itself in more than a single instance, as Chief Justice Gibson said must be the case? We have kleptomania and pyromania, which better works on medical jurisprudence tell us can not excuse crime where there is capacity to know the character of the act. Whart. & St. Med. Jur. §§ 592, 602, 616. Shall we introduce homicidal mania, and allow him of the manslaying propensity to walk innocent through the land while yet not insane, but capable of knowing the nature and wrong of his murderous act?

"For myself I can not see how a person who rationally comprehends the nature and quality of an act, and knows that it is wrong and criminal, can act through irresistible in-

nocent impulse. Knowing the nature of the act well enough to make him otherwise liable for it under the law, can we say that he acts from irresistible impulse, and not criminal design and guilt? And if we are sure he was seized and possessed and driven forward to the act wholly and absolutely by irresistible impulse, his mind being diseased, how can we say he rationally realized the nature of the act—realized it to an extent to enable us to hold him criminal in the act? How can the knowledge of the nature and wrongfulness of the act exist along with such impulse as shall exonerate him? Can the two co-exist? The one existing, does not the other non-exist?"

The opinion then quotes from *State v. Nixon,* 32 Kan. 205, 4 Pac. 159, as follows:

" 'It is possible that an insane impulse is sometimes sufficient to destroy criminal responsibility, but this is probably so only when it destroys the power of the accused to comprehend rationally the nature, character, and consequences of the particular acts, and not where he still has the power of knowing the character of the acts, and that they are wrong. . . . The law will hardly recognize the theory that an uncontrollable impulse may so take possession of a man's faculties and powers as to compel him to do what he knows to be wrong and a crime, and thereby remove him from all criminal responsibility. Whenever a man understands the nature and character of an act, and knows that it is wrong, it would seem that he ought to be held legally responsible for the commission of it.' "

The opinion in the *Harrison* case continues:

"I admit the existence of irresistible impulse, and its efficacy to exonerate from responsibility, but not as consistent with an adequate realization of the wrong of the act. It is that uncontrollable impulse produced by the disease of the mind, when that disease is sufficient to override the reason and judgment, and obliterate the sense of right as to the act done, and deprive the accused of power to choose between them. This impulse is born of the disease, and when it exists capacity to know the true nature of the act is gone. . . .

"It seems to me to be very dangerous to life to tell juries that a party may know the nature of his murderous act, and know and be conscious that it is wrong and criminal, and yet be excusable if he did the act at the command of irresistible impulse; thus eliminating the knowledge of the

wrong of the act as an unessential, unimportant element in the test. I do not regard it essential to the safety of the parties accused."

In *State v. Knight,* 95 Me. 467, 50 Atl. 276, 55 L. R. A. 373, the accused was indicted and tried for murder. The only issue raised in defense was the defendant's insanity. Error was assigned upon the refusal of the trial court to give certain requested instructions on the theory of irresistible impulse, and upon certain instructions given. In discussing the questions raised relative to the instructions, the court stated:

"It is not in controversy that the instructions actually given to the jury were in entire harmony with the intellectual test of criminal responsibility approved in *State v. Lawrence,* 57 Maine, 574, and cases there cited, and that the refusal to give the requested instructions was fully justified by the doctrine of that case. But, it is earnestly contended, by the learned counsel for the defendant, that an uncontrollable insane impulse to commit a criminal act may coexist with full knowledge of the wrongfulness of the act, and that the legal test of responsibility for crime afforded by the knowledge of right and wrong, respecting the act committed, has proved to be insufficient and unsatisfactory. It is accordingly insisted that the time has now arrived, when this criterion of responsibility can be safely modified by incorporating into the rule the element of irresistible impulse presented in the defendant's requests.

"It is undoubtedly true, that in the progressive development of the medical jurisprudence of insanity more enlightened views have gradually prevailed respecting the functional activity of the mind, and the course of symptoms indicating mental disease, and that just conclusions have more frequently been reached by courts and juries in recent years in regard to the relation of insanity to criminal responsibility. But since the announcement of the decision by this court in *State v. Lawrence, supra,* in the year 1870, this abstruse and difficult question has been the subject of exhaustive re-examination and renewed study, in the light of all modern discoveries of scientific truth bearing upon it by the most eminent medical and legal jurists in this country and England, and by courts of the highest authority in both countries; and it is still held by an overwhelming weight of judicial authority that when the insanity of the accused is pleaded in defense, the test of his responsibility for crime afforded by his capacity to understand the nature and

quality of the act he was doing, and his mental power to distinguish between right and wrong with respect to that particular act at the time he committed it, is the only proper legal criterion; and that when fully developed and explained to the jury, in its application to the special facts and circumstances of different cases, it will always be found adequate to meet the demands of justice and humanity towards the accused, as well as to insure the protection and safety of the public."

It was held in the cited case that the requested instructions were properly refused.

The right and wrong test was approved in *State v. Quigley,* 135 Me. 435, 199 Atl. 269, decided in 1938.

The supreme court of Oregon has rejected the irresistible impulse doctrine as late as *State v. Wallace,* 170 Ore. 60, 131 P. (2d) 222, decided in December, 1942, and therein refers to *State v. Knight,* 95 Me. 467, 50 Atl. 276, hereinbefore quoted from.

See, also, *People v. Irwin,* 166 Misc. 751, 4 N. Y. S. (2d) 548, decided in 1938.

In view of the assignment of error made by appellant and our conclusions thereon, as hereinbefore stated, it follows that the trial court committed no error in refusing to give the proposed instruction on irresistible impulse.

While, in view of what we have said herein, it would not, in our opinion, be necessary to set out any of the evidence in this case, nevertheless we desire to state the actions of appellant on the evening of the murder, appearing in the three statements made by him, hereinbefore referred to. These statements were introduced without objection, and no contention is made that they do not describe just what occurred.

Appellant is a boy sixteen years of age and was a junior in the Vancouver high school. The first statement made by him (exhibit No. 10) is as follows:

"I, Joseph Henry Maish make the following statement of my own free will and without any threats or promises on the part of the officers in charge of this case. No promises, rewards, or immunity was offered me for making this statement nor was violence used in obtaining same from me. This is a voluntary statement on my part.

"On the evening of December 21, 1946 at about 9:00 P. M. I went to the home of Ted Tamis at 117 West 23rd St. in Vancouver, Washington to see him if he was going skiing at Mt. Hood tomorrow, I went to his place and rang the door bell and a girl came to the door and I asked her if Ted was home and she told me that he had left before she got home. I then asked her if she knew if he was going skiing tomorrow and she said that he had said nothing about it but that he had mentioned that he wanted to go up there during Christmas vacation.

"I then went over to the Mission Theatre on Main Street and stood there awhile waiting to see if I could see any one that I knew. I stood there about ten or fifteen minutes and then went back to 117 West 23rd Street and walked up the driveway at the back door of the house and tried the door and found it unlocked, I opened the door and went into the kitchen to the door leading to the dining room and I saw the same girl that came to answer the door when I first went to the house sitting at a table in the living room typing a letter; she stopped typing and came toward the dining room, I got scared and started to run out the back door again and I saw a large knife lying on the drainboard by the kitchen sink, I picked up the knife and turned toward the girl again and she grabbed me and we struggled into the dining room, I had the knife in my right hand and I plunged the knife at her in a downward motion, I struck at her again with the knife and then turned around and ran out the back door; I ran out and got tangled up in the shrubbery and then I ran south to 19th and Washington Street where I took off my outside sweater and threw it between two houses, I then ran on south to 18th Street where I flagged a passing car down and asked him to take me down the street to the police station. I got out of the car in front of the station and came in and told the officers what I had done.

"I did not know the girl and had only seen her a few times before when I went to see Ted Tamis.

"I have read the above statement and found it to be true and correct."

Later the same evening, he made another statement (exhibit No. 11) wherein he corrected some of the statements made in exhibit No. 10, especially in regard to when he picked up the knife. This later statement is as follows:

"I, Joseph Henry Maish would like to add this statement to the one just taken from me by the officers in charge.

"The only reason that I can give for going back to 117 West 23rd St. is that I was sure that the girl was alone and I was lonesome and wanted some one to talk to and I thought that if I could talk to her perhaps there would be a chance that I might have intercourse with her. I have had very little to do with girls and have never had intercourse with any girl. I got this thought while I was standing in front of the Mission Theatre and decided to go back.

"I want to correct a statement that I made before and that is in regard to when I picked up the knife. I picked up the knife when I first entered the kitchen and decided to threaten her with it and scare her into having intercourse with me. I thought that if I just talked to her she would just make fun of me and tell me to get out. When the girl first saw me I said, 'Come here,' and stepped forward toward her, and she tried to push me away, then I became frightened that she would run out of the house and tell some one about it and I struck her with the knife. We struggled around some and she was making gasping noises, I broke free and ran out the back door.

"I have read the above statement and found it to be true and correct."

On the following morning, December 22, 1946, appellant made the third statement (exhibit No. 17) to the juvenile officer. This statement corresponds generally with the two statements previously made, but goes into more detail concerning his actions, and refers to an ice pick found on appellant at the time of his arrest. He procured this ice pick at home before he left. In this third statement, the following appears:

"Mr. George [the juvenile officer]: Joe, I noticed in your property an ice pick.

"Joe: I don't know really why I took it, just to have something to carry, maybe to stop some girl on the street to have sex relations."

Aside from this boy's own statements, there was testimony by his teachers and neighbors, all of which was to the effect that his behavior was good. There was no evidence that he had ever before committed a crime, or showed any criminal tendencies. There was ample testimony by medical men,

who were specialists in psychiatry, that he knew the act he was about to commit was wrong. We quote from the testimony of Dr. Herman A. Dickel, who had examined the boy twice and knew all the facts shown by the testimony in the record relative to the boy. Dr. Dickel was asked whether or not the boy was egocentric.

"A. I would consider him that sort of individual. Q. Was that your finding and diagnosis? A. Well, the word egocentric isn't particularly a diagnosis. It is merely a descriptive term to show an individual's general emotional response. My diagnosis was that of a psychopathic personality. If you want to put a sub-type to it, I would put sexual perversion with a sadistic tendency. Q. What do you mean by a sadistic tendency? A. An individual who and in whom the release of sex desires are associated with acts of violence on some other individual. . . .

"Q. In your opinion, Doctor, and based upon your consideration of all of the evidence, did Joseph Maish know that the act which he was about to commit on LaDonna Toscas was wrong? A. I feel he did. Q. And what information, Doctor, of that given to you or that you determined in your examination impressed you with that conclusion? A. Well, a number of different things. In the first place, from what I was told and from what he told me, he started out that evening with the idea of having sex relations with someone. He prepared to do that by taking something along to use force [ice pick], if necessary, and he did it in such a way that he knew he couldn't do it openly but would have to be careful so that no one discovered that he was doing it; that would indicate that he at least recognized that there was something wrong about it."

Dr. Henry Dixon, who has limited his field to psychiatry, was also called by the state. He had examined appellant, and had been informed of all his activities and of the events leading up to the crime herein charged. The doctor stated that in his opinion the boy's personality was of a type called psychopathic personality.

"Q. What do you mean by the term psychopathic, Doctor? A. It is a term that we have used for a long period in our field to designate the individual who acts impulsively without thought of consequence yet that has the concept of the difference between right and wrong. . . .

"Q. Now, Doctor, based upon your examination and consideration in connection with Joseph Henry Maish, would you say that he was sane or insane at the time he went into the Tamis home and attacked LaDonna Toscas? A. I would say that he would be classified as sane, as knowing the difference between right and wrong."

We appreciate that no question was raised in this case as to the insufficiency of the evidence to support the verdict on the theory on which, under the court's instructions, it was submitted to the jury; but, in view of the nature and seriousness of the case, we feel justified in setting out the above evidence.

We are of the opinion appellant was accorded a fair trial in every respect, that the trial court committed no error in refusing to give the requested instruction, and that the judgment and sentence of the trial court must be, and it is, affirmed.

MALLERY, C. J., BEALS, STEINERT, and ROBINSON, JJ., concur.