[No. 36335.    En Banc.    January 3, 1963.]

THE STATE OF WASHINGTON, *Respondent*, v. FRANKIE CHLOIS MOORE, *Appellant.*\*

\*Reported in 377 P. (2d) 456.

*W. Gordon Kelley* and *Tonkoff, Holst & Hopp*, for appellant.

*E. R. Whitmore, Jr.*, for respondent.

HILL, J.—This is an appeal from a conviction of murder in the first degree on two counts.

The victims were the defendant's husband, Elliston Moore, and Mrs. Elva Davidson. They were admittedly shot and killed by the defendant in the Moore home about 10:30 p.m., Saturday, June 3, 1961, after they had retired for the

night (the husband on a daveno in the living room, and Mrs. Davidson and the defendant in the same bed).

The defendant's testimony, regarding the events immediately prior to the shooting, was that on the preceding Tuesday she had asked her brother to get her a gun because, after her divorce action was commenced, she expected to be living alone in the house and wanted it for protection. She testified further that her brother brought a .38 revolver to her on Saturday afternoon, and that she hid it under a pillow or small cushion on an old daveno in a spare room.

It is established that Mrs. Davidson had just commenced a divorce action. The defendant's testimony was that over her protest, her husband had insisted that Mrs. Davidson have lunch in their home on Saturday; that after her husband returned to work after lunch, Mrs. Davidson admitted sexual relations with the defendant's husband extending over a considerable period of time.

The defendant further testified that her husband forced her to go to the Davidson home for dinner that evening (Mr. Davidson was absent on a trip); that after dinner the three of them drove about in the Moore pick-up, arriving at the Moore home at about 9:30 p.m.; that at that time Mr. Moore announced that Mrs. Davidson would (to quote the defendant) "move in with us and stay the ninety days until we got the divorce."

The defendant then went into the bedroom. She testified that she was sure that there were further intimacies between her husband and Mrs. Davidson in the living room, although she did not see them. Mrs. Davidson joined her in the bedroom at about 10 o'clock.

From the defendant's confession to the sheriff (which differs in some significant details from her testimony at the trial), the jury could have found: That after being in bed for about 30 minutes, she got up, went into the spare room, secured the revolver, then went into the living room and shot her husband in the head (the physical evidence was that the shot had been fired with the muzzle of the revolver less than one-half inch from where the bullet

entered his forehead); that the defendant then went to the bedroom and shot at Mrs. Davidson, who had been awakened by the first shot. In her confession the defendant said,

" . . . I don't know where the shot hit her, but she didn't die, and I knew that she wasn't dying, she was struggling, and I shot her again. . . ."

(The physical evidence was that the first shot fired at Mrs. Davidson went into the top of her head. It was fired from some distance away and would not necessarily cause death, but would render the victim unconscious; the second shot into the right eyebrow, was from a distance of approximately 6 inches away and did cause death.) The defendant then called her brother who, after arriving at the scene, notified the sheriff's office. Two officers responded to the call; the defendant was taken first to a hospital, where she was examined, and then to the sheriff's office, where she immediately made the confession to which we have referred.

She was charged with murder in the first degree on two counts. The plea was not guilty, and not guilty by reason of insanity.

The jury found her guilty of murder in the first degree on both counts, but did not impose the death penalty.

There are six assignments of error, but only two major issues are raised: (1) the admissibility of the defendant's confession; and (2) whether there should have been an instruction on manslaughter.

There is no contention that the defendant's confession was obtained as the result of "fear produced by threats,"[1] or that it was not entirely voluntary. There was no prolonged questioning, and her statement was given in response to the sheriff's invitation to tell him exactly what had happened.

The test as to admissibility, which we have consistently applied to confessions, is: "Did the accused supply

---

[1] "The confession of a defendant made under inducement, with all the circumstances, may be given as evidence against him, except when made under the influence of fear produced by threats; but a confession made under inducement is not sufficient to warrant a conviction without corroborating testimony. [Code 1881 § 1070; 1873 p 234 § 232; 1854 p 117 § 96; RRS § 2151.]" RCW 10.58.030.

the information voluntarily, considering all the circumstances?" *State v. Self* (1961), 59 Wn (2d) 62, 78, 366 P. (2d) 193, 203; see *State v. Johnson* (1959), 53 Wn. (2d) 666, 335 P. (2d) 809; *State v. Winters* (1951), 39 Wn. (2d) 545, 236 P. (2d) 1038.

A more rhetorical statement is found in *Culombe v. Connecticut* (1961), 367 U. S. 568, 602, 6 L. Ed. (2d) 1037, 81 S. Ct. 1860:

" . . . The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers v. Richmond*, 365 U. S. 534. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

This was the rule approved and applied by the trial court in the present case.

The defendant urges that the confession was inadmissible under the due process clause of the Fourteenth Amendment (U. S. Constitution) because she was not advised: That she was under arrest; that she did not have to make a statement; that anything she said might be used against her; and that she had a right to consult a lawyer.

All of these contentions, except that she was not advised of her right to counsel, were disposed of in *State v. Brownlow* (1916), 89 Wash. 582, 154 Pac. 1099, where we said:

" . . . The confession was properly admitted. It was not necessary to remind her that she was under arrest, that she was not obliged to reply, and that her answers would be used against her. There was no inducement, fear, or threat. The statement was voluntary. . . ."

Accord: *State v. Dildine* (1952), 41 Wn. (2d) 614, 619-620, 250 P. (2d) 951, 954.

There is authority for the proposition that the admission in evidence of a confession obtained in the absence of counsel, after indictment, is a denial of due process: *People v. Waterman* (1961), 9 N. Y. (2d) 561, 175 N. E. (2d) 445; 28 Brooklyn L. Rev. 157 (1961); also that the admission of a confession secured after a request for counsel, either before or after a charge has been filed, is a violation of the right to counsel. See the concurring opinion of Mr. Justice Douglas in *Culombe v. Connecticut, supra.*

█ We are not concerned with either situation here. No information had been filed and no request for counsel was made. No cases are cited, and we have found none making it necessary to advise a suspect (as distinguished from an accused) that he has a right to counsel before making a confession. To the contrary, it is clear that due process does not guarantee an arrested suspect the opportunity to consult a lawyer, absent any request therefor. See Judge Foster's concurring opinion in *State v. Self, supra,* where he says:

"*Cicenia v. LaGay,* 357 U. S. 504, 2 L. Ed. (2d) 1523, 78 S. Ct. 1297 [the suspect was denied the opportunity to confer with a lawyer whom he had already retained], and *Crooker v. California,* 357 U. S. 433, 2 L. Ed. (2d) 1448, 78 S. Ct. 1287 [no lawyer had been retained at the time of the request], decide that the due process clause of the Fourteenth Amendment does not guarantee *an arrested suspect* an absolute right to consult a lawyer while being questioned by the police before a charge is filed."

Note, also, in *People v. Waterman, supra,* it is recognized that a suspect need not be advised of his rights or privileges when interrogated by the police or prosecuting authority prior to indictment.

The defendant relies primarily upon *Griffith v. Rhay,* 282 F. (2d) 711 (C. A. 9th, 1960). We see little in common between this case and that. Griffith was 19 years of age and of limited formal education. At the time his confession was secured, he was in the hospital following surgery and just after he had been given a narcotic to relieve him of pain. Here the defendant was a 38-year-old adult, with 2½ years of college, who had taught briefly in a high school.

She was not under the influence of drugs and she was not denied communication with anyone. Her brother had been with her after the killing, had accompanied her to the hospital and, doubtless, could have accompanied her to the sheriff's office. There was no holding the suspect incommunicado and no prolonged examination. As indicated, it was conceded that there was no coercion, duress, or inducements.

Considering all of the circumstances, we have no hesitancy in saying that the confession was "the product of an essentially free and unconstrained choice by its maker" and, therefore, voluntary. The trial court[2] did not err in admitting the evidence.

■ We find no merit in the further argument that to permit the sheriff to testify, as to all the information given him in the interview with the defendant, and then to permit the confession to be read in its entirety, accentuated the testimony and was prejudicial error. The case of *State v. Gregory* (1946), 25 Wn. (2d) 773, 171 P. (2d) 1021, relied on by the defendant, did not involve a confession and has no bearing on our present inquiry. The sheriff's testimony was clearly admissible, and the confession was admissible under a well-recognized exception to the hearsay rule. 3 Wigmore, Evidence § 816 (3d ed. 1940).

The second major issue was whether the jury should have been instructed on manslaughter.

■ Concededly, there are many cases holding that if there is any evidence on which a jury could reach a verdict of manslaughter, such an instruction should be given. *State v. Sill* (1955), 47 Wn. (2d) 647, 289 P. (2d) 720; *State v. Scheeler* (1954), 45 Wn. (2d) 661, 277 P. (2d) 341; *State v.*

[2]The trial court's ruling on the admissibility of the confession indicated a thorough investigation and complete grasp of this area of the law. We agree with the conclusion that this is a much stronger case for the admission of the confession than was made in the *Griffith* case, *supra*, or the *Haynes* case (*State v. Haynes* (1961), 58 Wn. (2d), 716, 364 P. (2d) 935). We agree further with the trial court's conclusion that the present case comes within the rule laid down by the Supreme Court of the United States in *Cicenia v. LaGay*, 357 U. S. 504, 2 L. Ed. (2d) 1523, 78 S. Ct. 1297.

*Gallagher* (1940), 4 Wn. (2d) 437, 103 P. (2d) 1100; *State v. Paschall* (1939), 197 Wash. 582, 85 P. (2d) 1046; *State v. Foley* (1933), 174 Wash. 575, 25 P. (2d) 565.

Equally numerous are the cases in which it is held that there being no evidence to support a verdict of manslaughter, such an instruction is confusing and should not be given. *State v. Petty* (1961), 57 Wn. (2d) 513, 358 P. (2d) 136; *State v. Farley* (1955), 48 Wn. (2d) 11, 290 P. (2d) 987; *State v. Hartley* (1946), 25 Wn. (2d) 211, 170 P. (2d) 333; *State v. Hiatt* (1936), 187 Wash. 226, 60 P. (2d) 71; *State v. McPhail* (1905), 39 Wash. 199, 81 Pac. 683.

The defendant testified that she did not intend to kill anybody. Her psychiatrist testified that, in his opinion, the defendant at the time of shooting was incapable of forming a conscious and deliberate intent; however, he also testified that she knew right from wrong; that she was not psychotic or insane; that her mental condition at the time of the shooting was not the product of a mental disease, but was the "product of emotions such as jealousy, fear, anger, and hatred."

If this is not the "irresistible impulse" doctrine, which the court has consistently rejected,[3] it comes very close to it.

The doctor's answer, as to inability to form an intent, was based on a hypothetical question which involved no reference to getting the revolver from the place where it was hidden, the range at which the lethal weapon was fired on each occasion and, indeed, none of the details of the actual shootings. Judge Mallery's statement, in *State v. Farley, supra*, is apropos:

" . . . Nevertheless, counsel contend that, if a layman can express an opinion as to the mental condition of a defendant at the time of committing a crime, there is even more reason for permitting a doctor to do so. This contention misconceives the Washington rule. In *State v. Gaul*, 88 Wash. 295, 152 Pac. 1029, with regard to a layman's testimony, we said:

---

[3]For the court's position on "irresistible impulse" see *State v. Maish* (1947), 29 Wn. (2d) 52, 185 P. (2d) 486, 173 A.L.R. 382, and *State v. White* (1962), 60 Wn. (2d) 551, 374 P. (2d) 942.

" 'The intent with which an act is done is a mental process, and as such generally remains hidden within the mind where it is conceived, and is rarely, if ever, susceptible of proof by direct evidence, but may be inferred or gathered from the outward manifestations, by the words or acts of the person entertaining it, and the facts or circumstances surrounding or attendant upon the offense with which he is charged.'

"Accordingly, a layman *who sees the commission of a crime* can describe the acts, the appearance, and demeanor of a defendant, from which inferences as to a defendant's mental processes may be drawn, but a doctor who was not present at a crime has no testimonial knowledge of the circumstances needed to support such inferences. In *State v. Davis*, 6 Wn. (2d) 696, 108 P. (2d) 641, we said:

" 'The witness [Dr. Rickles], of course, had no personal knowledge concerning the facts of the case, and his opinion on the question of premeditation or the lack of premeditation was inadmissible.' " (pp. 20-21)

We cannot conceive that, under the circumstances with which we are here concerned, the doctor's opinion that the defendant was incapable of forming an intent warranted an instruction on manslaughter.

■ Much as we may sympathize with the defendant's "jealousy, fear, anger, and hatred," resulting from the indignities and humiliation which had been heaped upon her, the subjective claim of lack of intent to kill is belied by all of the evidence. The testimony is that she was sane and knew the difference between right and wrong; yet she procured a revolver from a place where she had hidden it and shot her husband, holding the weapon a half-inch from his head, and shot Mrs. Davidson, holding it within 6 inches of her head.

Numerous instructions made it clear that intent was a prerequisite to the verdict of first-degree murder, which the jury returned. The jury was told that the intent with which an act was done is a mental process; that the act had to be done with a design to effect death; that it had to be a premeditated design; and that, for first-degree murder, there must not only be the intention to kill and the act of

killing, but there must be time for deliberation between the formation of the intent to kill and the killing.

Unless the defendant was not guilty by reason of insanity, there was no basis for any verdict but murder. There was no evidence that either of the killings was unintentional, or without design to effect the death of the victims. The trial court properly refused to give an instruction on manslaughter.

We will now briefly consider other assignments of error which we deem less significant and not of sufficient importance to warrant detailed consideration.

The trial court gave the customary instruction in homicide cases, which states:

"When the felonious killing or killings of one or more human beings by another is proven beyond a reasonable doubt, the law presumes that such killing or killings constitute murder in the second degree, unless excusable or justifiable.

. "If the State would elevate it to murder in the first degree, it must prove beyond a reasonable doubt that such killing or killings was premeditated." (Instruction No. 10)

The defendant urges, in a supplemental brief, that this instruction should not have been given because the presumption referred to cancels out the presumption-of-innocence instruction which the trial court gave.

■ No exception was taken to instruction No. 10 at the time of trial, and it is not properly before us. *State v. Evans* (1960), 57 Wn. (2d) 288, 356 P. (2d) 589; *Schneider v. Noel* (1945), 23 Wn. (2d) 388, 160 P. (2d) 1002.

■ We will, however, in a case of this character consider the defendant's contention. The argument in her behalf is ingenious, but specious. The instruction makes clear that a felonious killing or killings must have been established beyond a reasonable doubt before the so-called presumption comes into play. It is not, therefore, inconsistent with instruction No. 5, which told the jury that the presumption of innocence

" . . . continues with the defendant throughout all the stages of the trial, and until . . . the jury has found

that this presumption has been overcome by the evidence in the case, beyond a reasonable doubt."

It may be that some better phraseology could be found for instruction No. 10, for it is not a true presumption of fact but a description of the burden of proof. In any event, we are satisfied that there was no error in the giving of that instruction.

Error is claimed because the trial judge did not reduce his findings on the admissibility of the confession to writing immediately after the hearing. Rule of Pleading, Practice and Procedure 101.20W (c)[4] does not so require. The purpose of the rule is to have a record made, and that was done.

Although error is assigned to the limitation of the testimony offered through the defendant's psychiatrist, our attention is not directed to any testimony which was offered and improperly rejected, or to any offer of proof that should have been admitted.

Error is assigned to the omission of the element of apparent danger from instruction No. 22; however, this aspect of self defense was fully covered in instruction No. 21.

The defendant contends that her proposed instruction No. 19 gave a clearer definition of mental irresponsibility than instruction No. 27, given by the court. As pointed out in the state's brief, that is a matter of opinion. There is no contention that the court's instruction does not clearly state the law. Other suggestions that instructions proposed by the defendant were preferable to those given by the court are without substantial merit, and no prejudice is indicated.

There are circumstances in this case which suggest leniency in the matter of the minimum sentence. We, of course, know only one side of the situation leading up to

[4]"*Duty of Trial Judge to Make a Record.* After the hearing the trial judge shall set forth in writing (1) the undisputed facts; (2) the disputed facts; (3) his conclusions as to the disputed facts; (4) his conclusion as to whether the confession was voluntary and admissible, or involuntary and inadmissible, with reasons in either case."

the killing. If there was another side, the lips of the parties[5] who could testify concerning it were irrevocably closed by the defendant. To determine all of the pertinent facts in the fixing of the penalty, which society should exact for this double killing, is the function of the Board of Prison Terms and Paroles.

The judgment appealed from is affirmed.

FINLEY, C. J., DONWORTH, WEAVER, ROSELLINI, OTT, HUNTER, and HAMILTON, JJ., concur.

[5]Other evidence established that Elliston Moore was mercurial, moody, hot tempered, violent and vicious; on the other hand, the evidence was that Elva Davidson was active in the work of her church; was a devoted mother to her 13-year-old son; and was highly regarded in the community.