[No. 7518-7-I.   Division One.   January 5, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN HENRY EDMON, *Appellant.*

*Lewis H. Nomura* and *Hollis Hill* of *Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Gordon S. Jones, Deputy,* for respondent.

RINGOLD, J.—John Henry Edmon appeals a judgment and sentence entered upon conviction by a jury of second degree assault while armed with a deadly weapon and a firearm. The primary issue is whether the trial court erred when it excluded most of the psychiatric testimony offered by the defense. We reverse the judgment because the evidence was admissible and its exclusion denied Edmon a fair trial.

The defendant, a 44–year–old black man, was hired by Bethlehem Steel Corporation in 1978 through what he believed was an affirmative action program. He had unsuccessfully sought employment there for several years prior to

his hiring. On the job, he believed he was subjected to discriminatory racial treatment by his supervisor, Jerry Ballard. He eventually filed a grievance with the State Human Rights Commission protesting Ballard's discriminatory scheduling practices and his refusal to transfer him from a dangerous job on which he had been injured.

On August 11, 1979, Edmon arrived at work after an evening of partying and drinking. He entered into an angry discussion with Ballard. Their confrontation culminated when Edmon threatened Ballard, hit him twice and shot him in the stomach with a .22 caliber pistol. One hour later Edmon had a blood alcohol reading of .13 percent.

The State filed charges of first degree assault[1] while armed with a deadly weapon and a firearm. At trial, Edmon testified that he had only 3 hours sleep during the 24 hours preceding the shooting and that he could not recall the incident. He did not contest the shooting but offered a psychiatric defense.

The trial court admitted psychiatric testimony that tended to show Edmon did not have the ability to form certain mental states as a result of alcohol and lack of sleep.[2] The court excluded testimony offered to prove this

---

[1]RCW 9A.36.010(1)(a) reads:

(1) Every person, who with intent to kill a human being, or to commit a felony upon the person or property of the one assaulted, or of another, shall be guilty of assault in the first degree when he:

(a) Shall assault another with a firearm or any deadly weapon or by any force or means likely to produce death . . .

Submitted to the jury as a lesser included offense was RCW 9A.36.020(1)(b), (c) which reads:

(1) Every person who, under circumstances not amounting to assault in the first degree shall be guilty of assault in the second degree when he:

. . .

(b) Shall knowingly inflict grievous bodily harm upon another with or without a weapon; or

(c) Shall knowingly assault another with a weapon or other instrument or thing likely to produce bodily harm . . .

[2]The jury was given a voluntary intoxication instruction: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of

same impairment as a result of medically recognized mental disorders. Also excluded was evidence of greater impairment caused by the combined effect of the alcohol, lack of sleep and mental disorders.

In his offer of proof, Edmon presented psychiatric evidence that he suffered from the medically recognized mental disorders of anxiety and depression. Based upon a hypothetical, the psychiatrist was asked his opinion about the defendant's ability to form certain mental states. The hypothetical included the defendant's background, his mental disorders, the difficulties with his supervisor, and the other circumstances surrounding the shooting. In the psychiatrist's opinion, the person described in the hypothetical was likely to be severely impaired in his ability to form the intent to kill or to injure and in his ability to act willfully and voluntarily.

He gave the following reason for his opinion:

Well, the hypothetical represents one of the most explosive scenarios that I think could be developed to destruct this man's ego integrity and completely disorganize his ego state at the time, and most likely would impair his ego controls, his conscious perception of the reality of the situation and result in a massive, diffuse, destructive attempt, including self–destructive, in order to maintain his, his own sense of identity, which, of course, is maladaptive. It's a self–destructive mechanism. . . . Well, as I say, this is an extremely charged scenario, and the likeliest possibility is that this man in the instant referred to here is going to be blinded. He's going to lose his conscious sense of self–identity and react with a massive, diffuse depersonalized type of destructiveness just to restore his own sense of identity.

It's a maladaptive defense, but, nonetheless, a defense, and perhaps it's best understood in terms of defense of saying that, "I do this, therefore I am, I exist."

---

that condition, but whenever the actual existence of any particular mental state is a necessary element to constitute a particular kind of [sic] degree of crime, the fact of intoxication may be taken into consideration in determining such mental state."

The psychiatrist testified that a .13 percent blood alcohol level would tend to further dilute the ego control of a person suffering from anxiety and depression. The 3 hours of sleep "would increase the physiological irritability and decrease the ego control." The lack of memory of the shooting was described as a common experience after a traumatic incident.

The trial court gave three reasons for its exclusion of the mental disorder testimony:

1. It only tended to prove the inadmissible insanity defense known as irresistible impulse.

2. The psychiatrist's opinion was based upon a neurosis and lack of ego control rather than a psychosis or other mental disorder.

3. There was no logical connection in the testimony between a mental disorder and the lack of the requisite intent.

■ An expert may give an opinion regarding the defendant's ability to form a specific intent[3] when the following foundational requirements are satisfied:

1. The defendant lacked the ability to form a specific intent due to a mental disorder not amounting to insanity. *State v. Ferrick,* 81 Wn.2d 942, 506 P.2d 860, *cert. denied sub nom. Gustav v. Washington,* 414 U.S. 1094, 38 L. Ed. 2d 552, 94 S. Ct. 726 (1973); *State v. Martin,* 14 Wn. App. 74, 538 P.2d 873 (1975).

2. The expert is qualified to testify on the subject. *State v. Martin, supra.*

3. The expert personally examines and diagnoses the defendant and is able to testify to an opinion with reasonable medical certainty. *State v. Martin, supra.*

4. The expert's testimony is based on substantial supporting evidence in the record relating to the defendant

---

[3]This defense has sometimes been labeled "diminished mental capacity," *State v. Ferrick,* 81 Wn.2d 942, 506 P.2d 860, *cert. denied sub nom. Gustav v. Washington,* 414 U.S. 1094, 38 L. Ed. 2d 552, 94 S. Ct. 726 (1973), or "diminished capacity," *State v. Carter,* 5 Wn. App. 802, 490 P.2d 1346 (1971).

and the case, or there must be an offer to prove such evidence. The supporting evidence must accurately reflect the record and cannot consist solely of uncertain estimates or speculation. *State v. Tyler,* 77 Wn.2d 726, 466 P.2d 120 (1970), *vacated as to imposition of death sentence,* 408 U.S. 937, 33 L. Ed. 2d 756, 92 S. Ct. 2865 (1972); *State v. Martin, supra.*

5. The cause of the inability to form a specific intent must be a mental disorder, not emotions like jealousy, fear, anger, and hatred. *State v. Moore,* 61 Wn.2d 165, 377 P.2d 456 (1963); *see also State v. Cogswell,* 54 Wn.2d 240, 339 P.2d 465 (1959); *State v. Upton,* 16 Wn. App. 195, 556 P.2d 239 (1976).

6. The mental disorder must be causally connected to a lack of specific intent, not just reduced perception, overreaction or other irrelevant mental states. *State v. Martin, supra.*

7. The inability to form a specific intent must occur at a time relevant to the offense. *State v. Craig,* 82 Wn.2d 777, 514 P.2d 151 (1973).

8. The mental disorder must substantially reduce the probability that the defendant formed the alleged intent. *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962), *cert. denied,* 375 U.S. 883, 11 L. Ed. 2d 113, 84 S. Ct. 154 (1963); *State v. Carter,* 5 Wn. App. 802, 490 P.2d 1346 (1971).

9. The lack of specific intent may not be inferred from evidence of the mental disorder, and it is insufficient to only give conclusory testimony that a mental disorder caused an inability to form specific intent. The opinion must contain an explanation of how the mental disorder had this effect. *State v. Ferrick, supra; State v. Carter, supra.*

■ Our analysis to this point has been within the terms of the traditional rule that only *specific intent* can be negated by this type of evidence. The rule must be modified because RCW Title 9A was designed to replace concepts like specific and general intent with the four levels of

culpability in RCW 9A.08.010.[4] Wherever "intent" as defined in RCW 9A.08.010(1)(a) is an element of a crime, it may be challenged by competent evidence of a mental disorder that causes an inability to form "intent" at the time of the offense. Premeditation, of course, can still be negated by this defense. *See State v. Carter, supra.*

"Knowledge" also is subject to this defense. RCW 9A.08-.010(1)(b)(i) reads: "A person knows or acts knowingly or with knowledge when: (i) he is aware of a fact, facts, or circumstances or *result* described by a statute defining an offense . . ." (Italics ours.) The concept of specific intent involves an intent in addition to the intent to do the physical act. *State v. Nelson,* 17 Wn. App. 66, 561 P.2d 1093 (1977). Thus, an intent to produce a certain result from the act would be specific intent. The fine distinction between the intent to produce a result (specific intent) and the awareness of a result of one's conduct (knowledge) should not determine the admissibility of expert medical evidence of a mental disability caused by a mental disorder. We have previously recognized the relevance of voluntary intoxication to the existence of "knowledge." *State v. Norby,* 20 Wn. App. 378, 579 P.2d 1358 (1978). It would be incongruous to allow a defense to "knowledge" where the defendant was responsible for his mental state (voluntary intoxication) and to reject it where the defendant was not responsible for his mental state (mental disorder).

Applying these rules to the facts of this case, we conclude that the offer of proof satisfied the foundational requirements for the admission of an expert opinion that the defendant was severely impaired in his ability to form an intent to kill and an intent to injure. After personally examining the defendant, the psychiatrist diagnosed medically recognized mental disorders. Neither his expertise nor his diagnosis was challenged by the State. The diagnosis

---

[4]See the transmittal letter accompanying the proposed final draft of the criminal code prepared by the state bar association's task force on the criminal code.

and other relevant facts in the record were included in the hypothetical question that formed the basis for the doctor's opinions. His testimony logically connected the facts in the hypothetical, including the mental disorder, with his opinion concerning an inability to form intent at the time of the shooting. The opinion was supported by his explanation of the mechanism by which the ability to form intent was impaired.

The trial court concluded that the evidence should be excluded under the authority of *State v. Moore, supra.* Reliance on *Moore* was erroneous because the inadmissible evidence in that case was a psychiatric opinion of the accused's mental state where the psychiatrist testified that there was no mental disorder and the hypothetical question failed to accurately reflect the record.

The State argues that the evidence only tended to prove Edmon's inability to resist the impulse to commit the act due to a mental disorder. This "irresistible impulse" defense is not accepted in Washington. *State v. White, supra.* The State, in its argument, focuses on the testimony about impaired ego controls and an explosive scenario.

An irresistible impulse is one induced by a mental disease affecting the volitive powers so that the person afflicted is unable to resist the impulse to commit the act charged against him. He cannot control his own behavior even though his perceptive powers are unaffected and he understands the nature and consequences of the act charged and perceives that it is wrong.[5] *State v. White, supra; State v. Maish,* 29 Wn.2d 52, 185 P.2d 486, 173 A.L.R. 382 (1947). Where a psychiatrist testifies in terms of the defendant's "control system" and "ability to control," it is proper to instruct a jury that "irresistible impulse" is no defense. *State v. Cogswell, supra; see also State v. Vidal,* 82 Wn.2d 74, 508 P.2d 158 (1973).

---

[5]The trial court, therefore, correctly excluded psychiatric evidence of involuntariness. The opinion regarding willfulness was also properly excluded. That mental state was not an element of the crime.

Lack of "ego control," however, is an entirely different matter. As explained by the psychiatrist's testimony, "ego control" refers to the perceptive powers, not the volitive. Impaired ego control was described in the testimony as an impaired conscious perception of reality. The psychiatrist properly testified to a mental condition, *i.e.*, reduced perception, that, in his opinion, was part of the mechanism flowing from the mental disorder and impairing Edmon's ability to form the intent to kill or injure. An opinion unsupported by this explanation would have been inadmissible. *State v. Ferrick, supra; State v. Carter, supra; cf. State v. Martin, supra* (evidence that mental disorder caused reduced perception was inadmissible where testimony did not connect reduced perception to the lack of a relevant mental state).

An explosive scenario does not convert the testimony into evidence of irresistible impulse. The opinion must be based upon facts in the record, *State v. Tyler, supra,* and here the facts were explosive. The real problem is that law and psychiatry frequently disagree over concepts of mental responsibility, *State v. White, supra,* and there is a significant risk that a psychiatrist's testimony will contain statements that appear to be inadmissible. A portion of the testimony in this case contains a reference to the momentary escape of behavior impulses. Where there are statements that sound like "irresistible impulse," a properly phrased jury instruction will prevent their misuse. *State v. Vidal, supra.* If the gist of the testimony is admissible, however, the difficulty of reconciling the terms of psychiatry with those of the law should not deprive one of a legitimate defense.

The State next argues that the hypothetical question consisted of speculative facts. While it included a few of Edmon's "beliefs" which, standing alone, might have been too speculative, *State v. Tyler, supra,* the hypothetical satisfied all foundational requirements. It was proper to include "beliefs" along with other detailed information that

accurately reflected the facts in the record relating to the defendant and the case. *State v. Martin,* 14 Wn. App. 74, 538 P.2d 873 (1975).

Similarly without merit is the State's argument that the logical connection between the mental disorder and the inability to form intent was too strained or speculative. Because the opinion was based upon a hypothetical that included the mental disorder, the required logical connection was present. We also find nothing strained or speculative in that portion of the testimony that mentions a likelihood of severe impairment of the ability to form intent. With the complexity of these issues, absolute certainty would be an unrealistic requirement. Substantial reduction of the probability that the defendant formed the challenged mental state is the required showing. *State v. White, supra; State v. Carter, supra.* The jury then gives the opinion whatever weight it deserves.

Finally, the State is incorrect in its claim that only cases involving more readily recognizable disorders like psychomotor seizures can satisfy the test. *State v. Welsh,* 8 Wn. App. 719, 508 P.2d 1041 (1973). Edmon's mental disorders are not as obvious as a psychosis or a psychomotor seizure, but that does not destroy their logical connection to an inability to form intent.

Because Edmon was acquitted of first degree assault, the exclusion of the psychiatric opinion about his intent to kill was harmless error. His proffered defense, however, was also relevant to second degree assault. *State v. Welsh, supra.*[6] Assault was defined in the jury instructions as an intentional shooting. Exclusion of the psychiatric opinion about Edmon's ability to form an intent to injure denied him the opportunity to raise all grounds for his alleged inability to form the requisite intent. More significantly, it

---

[6]This defense, upon retrial, would be available for the form of second degree assault that has "intent" as an element and the form that has "knowledge" as an element. *See State v. Strand,* 20 Wn. App. 768, 582 P.2d 874 (1978). In his reply brief, Edmon concedes that his offered evidence is not a defense to simple assault.

entirely deprived him of his claim that the mental impairment was greater because of the combined effect of the mental disorders, the intoxication and the lack of sleep.

Edmon also assigns error to the entry of judgment on the firearm and deadly weapon findings in a second degree assault case. He argues that *State v. Foster,* 91 Wn.2d 466, 589 P.2d 789 (1979), was wrongly decided, and he contends that the result of the *Foster* decision violates certain constitutional provisions. Because this issue may not necessarily arise after remand[7] and because we are bound by the Supreme Court's decisions, we do not address these contentions.

Reversed.

JAMES, C.J., concurs.

ANDERSEN, J. (dissenting)—I do not agree that the trial court erred. I would affirm the defendant's conviction.

The defendant had been drinking heavily when he went to the Bethlehem Steel Corporation plant in Seattle carrying a pistol. While there, he struck his supervisor twice about the head with his fists, then followed him into his office where he shot him in the stomach. The victim was taken to the hospital where emergency surgery was required to save his life.

The King County Prosecuting Attorney charged the defendant with assault in the first degree while armed with a deadly weapon and firearm.

The central focus of the jury trial was on whether the defendant intended to kill the victim, in which event he could be found guilty of assault in the first degree, or whether the defendant had no such intent and in which

---

[7]The trial court did not have the benefit of the opinion in *State v. Tongate,* 93 Wn.2d 751, 613 P.2d 121 (1980), at the first trial. In case of a retrial, Edmon is entitled to a separate reasonable doubt and presumption of innocence instruction on the deadly weapon allegation. The reasoning of *Tongate* also requires this separate instruction on the firearm allegation.

event he could be found guilty of the lesser included offense of assault in the second degree.

At the trial, considerable defense testimony was admitted, including psychiatric opinion testimony, to the effect that the defendant's ability to form the specific intent necessary to convict him of assault in the first degree was impaired.

The jury found the defendant guilty of the lesser included offense of assault in the second degree and returned a special verdict that he was armed with a deadly weapon and firearm at the time.

Much of the defense psychiatrist's questioning was based on hypothetical questions, that is, on questions which were a combination of assumed or proved facts stated in such form as to constitute a specific state of facts upon which the expert's opinion could be given to the jury.

The appellate courts of this state have always held that the trial court has wide discretion in determining whether or not expert opinion evidence is admissible. *See* 5 R. Meisenholder, Wash. Prac. § 352 (Supp. 1979); ER 702. It is also basic that "[a] wide discretion *must* be granted the trial judge in exercising his judgment and common sense in determining limits upon expert testimony." (Italics mine.) *Poston v. Clinton,* 66 Wn.2d 911, 917, 406 P.2d 623 (1965).

Here the trial court exercised its discretion in refusing to admit into evidence certain of the defense psychiatrist's testimony. Such testimony was before the court by way of questioning of the witness outside of the jury's presence. In reviewing the trial court's discretionary ruling, our function is limited.

> *The sole issue is whether the trial judge abused his discretion. Such abuse occurs only if no reasonable person would take the view adopted by the trial court.*

(Italics mine.) *State v. Huelett,* 92 Wn.2d 967, 969, 603 P.2d 1258 (1979).

I do not believe that "no reasonable person would take the view adopted by the trial court." I feel just the opposite is true. The psychiatrist proposed to testify in such terms

as the following: explosive scenarios; impaired ego controls; impaired conscious perception of reality resulting in destructive attempts; the defendant being blinded by emotional factors; reacting with massive depersonalized destructiveness, etc. All of this was against a backdrop of the defendant's own testimony that something inside him simply "snapped" and he did not recall his deeds.

The experienced trial judge in denying the admission of such testimony fully explained the several bases for his ruling. Among other things, he pointed out that the court has "a responsibility to prohibit testimony that could mislead the jury and that is not probative to the legal issues before the court and jury." I agree. As illustrative of the psychiatric morass that was involved here, I have set out in the margin a brief colloquy wherein the psychiatrist characterizes his testimony concerning the "ego control" he was testifying about.[8]

The trial judge stated, among other cogent reasons, that the refused testimony "just sounds to me very much like irresistible impulse coming in the back door . . ." Again I

---

[8]Illustrative colloquy between the psychiatrist, trial court and deputy prosecuting attorney was as follows:

"THE WITNESS: Your Honor, if it is any help, what I am talking about is a disassociative reaction rather than a schizophrenic reaction, neurotic rather than ego autonomy, and, in my interpretation, specific intent does mean conscious and willful. I don't know if I can sit here and interpret it any other way. If you say specific intent to me, that's conscious and willful.

"THE COURT: All right, thank you.

"THE WITNESS: And in psychiatric terms, it refers to ego autonomy, and in this case you can have slippage, you can lose partial control rather than a complete control as in a flagrant psychosis.

"[DEPUTY PROSECUTING ATTORNEY]: Excuse me, Doctor. What about general intent, is that also, is that the same thing in terms of willfulness and ego autonomy?

"THE WITNESS: I think so, but I am not sure. I am talking about specific intent as motivation versus unconscious motivation.

"THE COURT: All right.

"THE WITNESS: Talking about free will versus determinus.

"THE COURT: This is extremely interesting and esoteric, and, as usual, we, the law and the psychiatry are at, I hope, creative tension, but at least we do have some disagreements."

agree. Since "irresistible impulse" is not a legal defense to a criminal charge in this state, *State v. White,* 60 Wn.2d 551, 591, 374 P.2d 942 (1962), the trial court's ruling was not erroneous. The defendant thus fell far short of carrying his heavy burden of proving an abuse of discretion by the trial court when it refused to admit the psychiatric testimony in question into evidence.

It is uncontroverted that the defendant was armed with a deadly weapon and firearm at the time he shot the victim. I see no merit in the defendant's further argument that his penalty should not be enhanced, as provided by law, because of that fact.

After a fairly conducted trial at which all legal defenses were fully presented and argued to the jury, the jury unanimously found beyond any reasonable doubt that the defendant was guilty of the crime of assault in the second degree. I would affirm the conviction.

Reconsideration denied March 6, 1981.

Review denied by Supreme Court May 8, 1981.